# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5333-15T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

L.G.,

    Defendant-Appellant.

_____

IN THE MATTER OF N.G., a Minor.

_____

Argued April 16, 2018 – Decided December 4, 2018

Before Judges Ostrer and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0296-12.

Clara S. Licata, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Clara S. Licata, on the briefs).

Salima E. Burke, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney

General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Salima E. Burke, on the brief).

Olivia Belfatto Crisp, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Olivia Belfatto Crisp, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Defendant L.G. (Lara)[1] appeals from three family court orders in this Title 9 case. See N.J.S.A. 9:6-8.21 to -8.73. In the first, entered January 2013, the court found that Lara abused or neglected her daughter N.G. (Nina), then six and a half years old, by "str[iking] the child with an object using excessive force causing bruising on the child." In the second, entered six months later, the court temporarily suspended visitation between Lara and Nina, based on, among other things, Nina's therapist's recommendation. Finally, three years later, after a problematic period of resumed visitation, the court terminated the litigation and ordered visitation between Lara and Nina remain "temporarily suspended" until Nina's therapist recommended that it resume.

---

[1] We use pseudonyms to protect the privacy of the parties.

A-5333-15T4

We affirm the first two orders.  We reverse the third, and remand for a plenary hearing.

We consider each challenged order in turn.

I. The Order Finding Abuse or Neglect.

A.

At the January 7, 2013 fact-finding hearing, the Division's caseworker and Lara testified.  Without objection, the court admitted into evidence Nina's medical evaluation by Dr. Gladibel Medina; the caseworker's investigation summary; six photographs of Nina taken by the caseworker after the abuse and neglect allegation was made; and Lara's psychological evaluation by Helen Raytek, Psy. D.  That record discloses the following facts.

In January 2012, Lara and her husband, Fred, began living separately after Fred told police that Lara had physically abused him.  Lara also claimed that Fred physically abused her.  She was removed from the home by the police.  Thereafter, their daughter lived with Fred during the week and spent weekends with Lara.

On April 30, 2012, Fred noticed bruising on Nina's thigh upon her return from Lara.  He called the Division and blamed Lara.  Nina initially told Fred that she hit herself at church, but Fred added that Nina said the same thing about

a shin bruise two months earlier. Then Nina said Lara hit her with a "brush hair," which Fred clarified was a comb. The caseworker reported Nina "indicated that her mother was angry when she was hit." Fred then reported he had observed Lara hit Nina with a closed hand in the past. Nina also stated Lara "pinches her cheeks and slaps her hand when she is in trouble." Fred alleged he had a temporary restraining order against Lara.

During a home interview, the caseworker photographed two bruises on Nina's thigh, each about two inches long. Nina said her mother hit her while she was combing her hair, but she did not know why. Nina also said her mother hits her with a belt, slaps her back with an open hand, pinches her cheeks, and hits her on the hand. Nina said she was hit "every time" she visited her mother. Nina reported that she feared her mother, but felt safe with her father.[2]

In a subsequent interview at Lara's home, Lara denied any physical violence toward Nina. Lara asserted she saw the bruises on Nina's thigh while giving Nina a bath. She said Nina told her she fell. Lara's brother and nephews, who resided with her, reported no concerns about Nina's well-being while in Lara's care; stated they observed no corporal punishment; but agreed that the

---

[2] Nina also reported that her father has hit her with a belt in the past, but her mother did so more frequently. Fred admitted it, but told the caseworker he would no longer discipline Nina in that way.

A-5333-15T4

relationship between Lara and Fred was marked by domestic violence. The day after her interview, Lara called the caseworker and alleged that Nina's babysitter, Lisa, who was also Fred's girlfriend, hit Nina and caused the bruises.

Nina reported to Dr. Medina that her mother "hits her with a comb on her body, pinches her cheeks, and hits her with a hand on her back. . . . whenever she does something wrong." She claimed, contrary to Fred's admission, that her father did not strike her. Dr. Medina concluded that the "purplish greenish bruising" on Nina's thigh were "consistent with the history [Nina] provide[d] of having been discipline[d] by the use of an object, in this case a comb. . . . The bruise marks . . . are indicative of an excessive amount of force used to discipline this child which is inappropriate."

Lara told Dr. Raytek she did not hit Nina. Lara suggested that Lisa was to blame for Nina's bruises, and Fred may have coached Nina. Dr. Raytek reviewed Dr. Medina's report and spoke with the caseworker. The caseworker told Dr. Raytek that Lara initially denied seeing any bruising on Nina's thigh. Lara called the caseworker the next day and said she now remembered the bruises but blamed Lisa.

Dr. Raytek said that the Million Clinical Multiaxial Inventory–III assessment indicated Lara was "capable of portraying a different version of an

incident when she feels criticized," and in her interview, she "showed a tendency to project blame on others and proclaim her innocence." Dr. Raytek concluded Lara was "at risk for physically abusing her daughter again because she lacks sufficient constructive ways to cope with stressors." He recommended Lara attend psychotherapy and sessions with a parent mentor, and have therapeutic visitation with Nina.

With minor deviations, the caseworker generally confirmed facts set forth in her investigation summary.[3]

Lara first testified that she noticed the bruises when bathing Nina on Sunday; asked Nina what happened; and Nina said "nothing." But, on cross-examination, Lara claimed she first saw the bruise when Nina was asleep on Saturday. Lara said that she did not want to wake Nina and therefore waited until the morning to ask about the bruises. She also claimed for the first time she called Fred about it on Saturday, and he said he knew nothing about it. She

---

[3] She testified that Fred saw the bruise on Nina's thigh while bathing her, although he said nothing about bathing, according to the Investigation Summary. The caseworker also testified that Lara initially denied seeing any bruises, but remembered them the following day and blamed Lisa. By contrast, according to the Investigation Summary, Lara admitted from the beginning that she noticed the bruises.

did not call the Division because she did not want to traumatize Nina, or get Fred in trouble.

Lara's counsel argued in summation that Lara did not strike Nina, but even if she did, it did not amount to abuse or neglect. The Law Guardian and the Division argued the court should credit Nina's allegation that her mother struck her, which was corroborated by other evidence, including the photographs, and the expert reports. The Division highlighted that an object was used to strike Nina, and Dr. Raytek found Lara not credible.

In finding abuse or neglect, the judge found that Lara struck Nina with a comb with substantial force, and that corporal punishment was excessive. The court found the caseworker credible, but found that Lara was not, noting inconsistencies in her testimony and her evasive demeanor. The court also noted Dr. Raytek's opinion that Lara was not being truthful.

The court noted that Nina consistently reported to the caseworker and Dr. Medina that her mother hit her with a comb. Her statements were corroborated by the photographs, and Dr. Medina's opinion that the bruises were consistent with being struck by an object with "excessive force." The judge also found credible Nina's assertion that defendant committed "other types of assaults,

meaning the belt, pinching, slapping," although the judge did not identify evidence that specifically corroborated that account.

The court concluded that the corporal punishment was excessive based on the nature of the injury, and the absence of mitigating circumstances. Distinguishing Department of Children and Families, Division of Youth and Family Services v. K.A., 413 N.J. Super. 504, 512 (App. Div. 2010), the court noted there was no evidence that Nina presented behavioral difficulties; or that Lara lacked support. Also, there was no evidence as to what prompted the striking. Lara declined to take responsibility for Nina's bruises. The court also found there to be a pattern of abuse, based on Nina's allegations of prior incidents. The court ordered therapeutic and supervised visitation between mother and daughter.

## B.

In challenging the finding of abuse or neglect by excessive corporal punishment, Lara contends Nina's statements were uncorroborated; the trial court relied on improperly admitted expert reports from the Division's two consultants; and one report "rendered an opinion as to the ultimate legal issue - whether the corporal punishment was excessive . . . ." She also asserts that she received ineffective assistance of counsel at the fact-finding hearing because her

counsel did not object to the expert reports, and failed to effectively cross-examine the Division caseworker, and advocate for her during summations.

We are not persuaded. We deferentially review the Family Court's factfinding, see N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012), as well as its evidentiary rulings, Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382 (2010). Determining whether a person has inflicted excessive corporal punishment is a particularly fact-sensitive endeavor, N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 33 (2011), since N.J.S.A. 9:6-8.21(c)(4)(b) prohibits excessive corporal punishment, not corporal punishment generally, Dep't of Children & Families, Div. of Youth & Family Servs. v. K.A., 413 N.J. Super. 504, 510 (App. Div. 2010). We will not disturb a trial court's fact-finding if "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998). We review issues of law de novo. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The trial court did not err in concluding that Nina's statements were corroborated, and therefore, admissible. Under Title 9, a child's hearsay statements relating to abuse or neglect allegations shall be admissible "provided, however, that no such statement, if uncorroborated, shall be sufficient to make

9

a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). "The corroborative evidence need not relate directly to the alleged abuser, it need only provide support for the out-of-court statements." N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002).

Physical evidence of assault is certainly corroborative. Ibid. The photographs of Nina's bruises suffice to corroborate not only her report that her mother struck her with a comb to cause those bruises, but also to support her allegation that her mother struck her on other occasions as well. Corroboration may also include "medical or scientific evidence." N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003). Dr. Medina's opinion that the bruises were caused by "excessive force" corroborate Nina's statement and belie Lara's claim that she fell. We recognize that the consistency of Nina's reports, noted by the trial court, does not alone constitute corroboration. See N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 523 (App. Div. 2017). However, Nina's statements were adequately corroborated by other evidence – the photographs and Dr. Medina's opinion.

We also reject Lara's argument that the court erred in admitting the expert opinions in Dr. Medina's report. She concedes that the report was admissible pursuant to Rule 5:12-4(d), which authorizes the Division "to submit into

evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by . . . professional consultants." However, she contends, absent Dr. Medina's in-court testimony, the opinions should have been excluded under N.J.R.E. 808, which bars embedded expert opinion "unless the judge makes specific findings regarding trustworthiness" under the circumstances. N.J. Div. of Youth & Family Servs. v. M.G., 427 N.J. Super. 154, 174 (App. Div. 2012).

We need not reach the N.J.R.E. 808 issue, because defense counsel did not object when the Division offered into evidence Dr. Medina's and Dr. Raytek's reports, and other documentary evidence. "Hearsay subject to a well-founded objection is generally evidential if no objection is made." N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 348-49 (App. Div. 2016). Nor was the judge obliged to reject the evidence absent an objection.

> In general, it is not the judge's responsibility, particularly in a bench trial with represented parties, to intervene with a well-founded hearsay objection, whenever counsel choose not to raise one of their own. When objectionable hearsay is admitted in a bench trial without objection, we presume that the fact-finder appreciates the potential weakness of such proofs, and takes that into account in weighing the evidence.
>
> [Id. at 349.]

Cf. In re Commitment of A.X.D., 370 N.J. Super. 198, 202 (App. Div. 2004) (stating "it would have been improper for the trial judge to have considered for

11

their truth any complex diagnoses that may have been contained in these reports, to the extent those diagnoses were contested") (emphasis added).

Lara has also not established that admission of Dr. Medina's opinions was "plain error." State v. Frisby, 174 N.J. 583, 591 (2002) (considering, under plain error analysis, admission of unobjected-to hearsay). Defendant has not successfully challenged the relevance or trustworthiness of Dr. Medina's opinion. See J.D., 447 N.J. Super. at 349. "[A]n appellant faces an especially high hurdle in an appeal from a civil bench trial to establish that the admission of such [hearsay] evidence constitutes 'plain error.'" Ibid.

We also reject Lara's contention that defense counsel was ineffective by failing to object to the two expert reports. She also claims her attorney was ineffective in cross-examination and summation. We have considered such claims under the two-pronged Strickland[4] test applicable to ineffective assistance of counsel claims in criminal cases: a party must show that counsel's performance was deficient and there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 307-09 (2007) (applying Strickland to termination of parental rights); N.J. Div. of

_____

[4] Strickland v. Washington, 466 U.S. 668 (1984).

Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 642-43 (App. Div. 2010) (applying Strickland to an abuse or neglect case).

Counsel's non-objection to the reports may have been based on a reasonable trial strategy. See N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010) (noting that defendant's counsel "may have made a strategic decision to try the case on the documents, instead of possibly facing a witness's direct testimony"). The reports were damaging, and live testimony, even with the opportunity to cross-examine, may only have strengthened the Division's case. In any event, Lara has failed to show that, but for the failure to object, there was a reasonable probability the result would have been different. She has presented no competing expert's report, or any significant inherent flaw in the experts' reasoning.

Lara's remaining arguments regarding the court's finding of excessive corporal punishment, and her claims of ineffective assistance, lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

## II. The Order Suspending Visitation

Defendant argues the court's decision to suspend visitation temporarily, after a plenary hearing, was not supported by clear and convincing evidence.

She also argues that the order prevented Lara from seeing Nina for an extended period of time, and harmed their relationship.

Two months after the court's fact-finding hearing, Nina's therapist, Dr. Lana Farina, advised the Law Guardian that Nina was diagnosed with post-traumatic stress disorder (PTSD). Nina had expressed to her therapist several times "that she does not want to visit her mother because she says bad things and she feels frightened when thinking about her past alleged threats." Dr. Farina reported that Nina said "her mother made threats to harm her father's girlfriend during visits while she accompanied her to the bathroom." The therapist reported a relapse in Nina's PTSD symptoms since allegations were made regarding inappropriate touching of Nina by Lara. Lisa had reported to the Division that Nina had told her "at the time she lived with her parents, [Lara] played with her touching her private parts." Although a medical examination found no physical corroboration, the judge required that Lara's visitation occur at the Division's office and be supervised.

Sueli Petry, Ph.D., supervised the visits. Dr. Petry reported that, "[Nina] seemed to enjoy play therapy sessions with her mother, and therapist is working on establishing rapport with the child as we have only completed two sessions." She recommended the joint sessions continue. However, Dr. Farina continued

14

to express concerns to the Division, stating "[Nina] continues to verbalize resistance to attending visits," and that after a recent session with Dr. Petry, Nina had an emotional outburst and said she had bad memories of the times Lara had hit her. Dr. Farina recommended that the visits stop.

In May 2013, the judge temporarily suspended visitation after an emergent hearing, and thereafter conducted a plenary hearing at which both mental health professionals testified. Dr. Farina asserted that earlier that year, she was prepared to transition Nina out of individual therapy, but Nina "began to demonstrate more PTSD symptoms again" after the sexual abuse allegations surfaced. Dr. Farina recommended that visits be suspended, without saying when it would be safe to resume them.

Dr. Petry testified that, as Lara's individual therapist, she prepared Lara for her sessions with Nina, with the goal of reunification. She said the first therapeutic session with Lara and Nina was "a little awkward at first" but that by the end, "[Nina] seemed to be getting more comfortable." Nina did not appear fearful of Lara; Lara was appropriate with Nina; they played together; and the sessions were uneventful. She opined that the visits should continue, but that if they did, she would want to coordinate with Dr. Farina to see if Nina was having a bad time outside of her purview. The judge admitted case records into

15

evidence, but sustained the Law Guardian's objection to the admission of records before February 2013. The Law Guardian argued they were irrelevant as they preceded the reports of sexual abuse.

In her decision, the judge found that both professionals testified credibly, but Dr. Farina's insights about the impact of the visitation on Nina were more persuasive, as she had been Nina's one-on-one therapist for seven months; and Nina was likely more candid with her, than with Dr. Petry, who had seen Nina only twice, and with her mother present. The judge noted that Nina, who was then seven years old, did not want to visit with her mother. The court credited Dr. Farina's view that the visitation at that time was not in Nina's best interest, and was causing her emotional distress. The judge found by clear and convincing evidence that the visitation should be suspended; and Nina should continue in therapy.

The court applied the appropriate standard of proof. "The denial of visitation rights is such an extraordinary proscription that it should be invoked only in those exceptional cases where it clearly and convincingly appears that the granting of visitation will cause physical or emotional harm to the children. . . ." V.C. v. M.J.B., 163 N.J. 200, 229 (2000) (stating that interference with visitation rights is an extraordinary step that requires clear and convincing

16

evidence).  The court also grounded its decision on sufficient credible evidence.

The court did not abuse its broad discretion under N.J.R.E. 403 in deciding to

exclude records of positive interactions that preceded the resurfacing of PTSD

symptoms in February 2013.  See Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480,

492 (1999) (stating that "[d]eterminations pursuant to N.J.R.E. 403 should not

be overturned on appeal 'unless it can be shown that the trial court palpably

abused its discretion, that is, that its finding was so wide off the mark that a

manifest denial of justice resulted'") (quoting State v. Carter, 91 N.J. 86, 106

(1982)).

Lara argues that the court gave insufficient weight to the possibility that

Fred was influencing his daughter's wishes.  However, the court acknowledged

but discounted those allegations, noting that Nina was making progress until

February 2013 despite any alleged interference by Fred.  Lara also contends that

Dr. Farina's opinion was flawed, because she based it on a diagnosis of PTSD

that was triggered by unproved allegations of sexual abuse.  However, Dr. Farina

testified only that Nina was re-experiencing PTSD symptoms because she was

fearful of past abuse, and expressed fear that Lara would hurt her or Lisa

physically, not sexually.  The court did not expressly give special weight to the

allegations, which at that point had not been fully investigated. In sum, we affirm the court's June 2013 order suspending visitation.

### III. The Order Terminating Litigation and Temporarily Suspending Visitation

### A.

Defendant argues the June 30, 2016, order terminating litigation while temporarily suspending Lara's visitation was not authorized by law or supported by clear and convincing evidence. Defendant also challenges, as a procedural error, the family court's decision to interview Nina in camera about whether she wanted visitation to resume. Defendant asserts the interview occurred without notifying Lara.

In the months after the suspension, Nina met with a new mental health professional, who recommended against Nina resuming visitation with her mother. Instead, Lara could, "at some point," be introduced into Nina's trauma therapy to heal and facilitate a healthy bond. In November 2013, Dr. Petry recommended resumption of therapeutic visitation, opining that Nina's recent behavioral problems were related to learning or neurological problems, not past trauma.

In the meantime, the Division reported that Fred and Lara had completed or been compliant with all services. The Division proposed in December 2013

that the court conduct a dispositional hearing, with the aim of terminating the Title 9 litigation, which Lara's attorney opposed, noting that therapeutic visitation with Nina and Lara had not resumed.

The court conducted dispositional hearings over eight days between May 2014 and August 2015. At the close of the hearings, the Law Guardian and the Division favored termination of the Title 9 case, and Lara did not. Lara also sought resumption of visitation, which the Law Guardian favored only when Nina's therapist thought it appropriate. Although the Division was previously aligned with the Law Guardian's position, it deferred to the court's judgment on visitation.

On August 4, 2015, the court decided to resume therapeutic visitation. The judge acknowledged Nina's wishes, but stated that sometimes "children have to be prodded." The court expressed concern that prolonging the extended period of no contact could become "an effective termination" of parental rights. The court decided to keep the case open, so the Division could facilitate the therapeutic visitation.

Therapeutic visitation began between Lara and Nina on September 8, 2015 with a new therapist, and continued until February 2016. Nina was hesitant initially, but seemed more relaxed in the second session a week later. However,

19

her personal therapists reported that Nina's "initial feelings of fear and discomfort had not subsided after attending the two visits." Nina was worried Lara would hurt her, Fred, or Lisa, and stated she did not want to see her mother "ever again." Nina also reportedly had episodes of vomiting at school, related to stress and anxiety. In the third and fourth visits in late September and early October, Nina seemed uneasy at first, then willing to interact with Lara, but sometimes burst into yelling and confronted Lara about the past abuse. After a compliance review hearing on October 14, 2015, the court asked the visitation therapist to provide an opinion on whether the visits should continue.

During an October 20, 2015 visit, Nina "showed resistance and feelings of distrust toward her mother" and when her mother was going to engage in play with her, Nina screamed, cried, and hit the therapist, and the visit ended early. After two sessions with Nina alone, at which she expressed her fear and distrust of her mother, the therapist opined that visitation could resume.

At the visits on December 15, 22, and 29, 2015 and February 2 and 23, 2016, the visitation therapist reported that "Nina . . . seems more comfortable and talkative" but she regressed when she did not attend consistently.[5] Nina

---

[5] Apparently, there was no visitation on December 1 and 8 due to "no shows," and there were also no visits in January, because the visitation therapist was out

"denied difficulties at school, [physical] complaints, and nightmares." The therapist emphasized the importance of visitation on a consistent basis, which the court ordered. Visits continued in March, April and May 2016. An early May report from the visitation therapist generally described the sessions in positive terms and recommended they continue. She wrote that progress was "remarkable," and "[Nina] showed significantly more interest, less resistance and more feelings of trust."

Before the May 17, 2016 compliance hearing, the court granted the Law Guardian's request that Nina, then ten years old, be allowed to speak with the judge. In the presence of the Law Guardian and an investigator, Nina volunteered at the outset, "I don't want to see [Lara] because she's disappointing to me." Nina complained that the visitation therapist forced her to play with her mother. In response to the leading question whether she felt safe during visitation, Nina said she did not, even though the therapist was present. Nina admitted that her mother "acts nice, but I know that she's not – nice." Asked how her mom appeared in the visitation sessions, Nina provided a disjointed response: "[S]he was – whatever – because when daddy needs something, daddy

---

of the office for two weeks, and there were scheduling conflicts for the other two.

A-5333-15T4

goes – sometimes she acts mean and she's just - - ."  The judge was able to elicit through leading questions that Nina, while in the company of her father and "step-mom," saw her mother outside therapy, and in the suggested words of the judge, looked at her "funny."  She could not recall when it happened, but when the judge asked if it happened "last summer," Nina agreed.

Regarding her father's involvement, she first denied that she talked to her dad about continuing visits with her mother.  But when asked if her father knew how she felt, and what he had said, Nina answered, "He said it's okay – once when you're older, it's gonna be over."  Asked if she discussed the visits with her personal therapist, Nina said, "I don't say nothing.  I don't say nothing."  The judge told Nina that she "actually thought we were doing pretty well with our visits, from the last reports.  So I'm surprised by your feelings."  Nina repeated, "I don't want to see her anymore."

After Nina's interview, the court conducted a lengthy colloquy with counsel.  Notably, Lara's counsel did not object to the child interview.  The judge reported that during the interview, Nina was emotional when she stated she did not want to see her mother.  The Law Guardian said he was surprised by Nina's position, in view of the visitation therapist's reports.  The judge was troubled by the disparity between the visitation therapist's generally positive reports, and

22

Nina's opposition expressed to her therapist and now the court. Although the judge expressed her intention to continue visitation, she then accepted the Law Guardian's suggestion that the court suspend the therapeutic visitations until the end of the school year in June. The Law Guardian stated that the delay would allow the parties to test whether Nina's behavior at school was connected to visitation. The court agreed. "It's probably the better way to go – we'd probably learn more doing that, th[a]n we do the other way. . . . So there's a lot of benefit from at least temporarily suspending it – but not for too long."

On June 30, 2016, the Division asked that the litigation be terminated, as Lara's services through the Division had been completed and there were no further concerns of abuse or neglect. Notably, the Division's report to the court recommended continuation of therapeutic visitation between mother and daughter.

The Law Guardian reported that Fred, who opposed visitation, asserted that Nina's behavior improved since visits were suspended. But the Law Guardian stated that the Law Guardian's investigator "got a somewhat different read" after interviewing the school nurse, teacher, guidance counselor and school social worker, that Nina "has continued to demonstrate certain behavior, albeit, I think they're lesser to a certain extent." The behaviors included

"vomiting or disrupting the class, getting extremely upset . . . when she doesn't get what she wants . . . ." The June observations in a progress report from Nina's school, related to her individualized education plan, did not vary from those in April, when therapeutic visitation was ongoing. Nina reportedly continued to say she did not want to not see Lara.

Lara's counsel objected to the termination if there was no provision for active visitation in place; and contended that clear and convincing evidence was required to suspend visitation permanently.

The judge ordered the litigation terminated, because services were completed and there were no longer issues of abuse or neglect. The judge left the therapeutic visitation in place, albeit temporarily suspended, with instructions for "the therapist to revisit the ability to get back into therapeutic visitation" on a monthly basis. The judge directed that Lara and Fred could file under the FM docket for any changes in the visitation they desired.[6]

---

[6] After a limited remand, the trial court clarified its June 30, 2016 order to provide that legal custody remained shared between Fred and Lara; and Nina's therapist was to report to Lara monthly on the propriety of resuming visitation. Those reports are not before us.

Lara contends the court did not comply with the rule and statute governing child interviews. She also contends that the court erred in suspending visitation, without finding, by clear and convincing evidence after a plenary hearing, that it was necessary to protect the child. She also contends the court erred in terminating the Title 9 litigation.

With respect to the child interview, Lara contends the court failed to provide her counsel with notice of the interview, and the opportunity to submit questions, as required by Rule 5:8-6. She also contends the court failed to adhere to the procedures outlined in N.J.S.A. 2A:84A-32.4, specifically that "there is a substantial likelihood . . . [Nina] would suffer severe emotional or mental distress if required to testify" in open court.

In New Jersey Division of Child Protection & Permanency v. C.W., 435 N.J. Super. 130, 135 (App. Div. 2014), we held that in a protective services action, "when a defendant objects to utilizing an alternative to the child's in-court testimony, the judge must adhere to the statutory procedures outlined in N.J.S.A. 2A:84A-32.4, prior to allowing in camera testimony of a child witness." Furthermore, a judge must determine that the child-witness is competent and understands the need to tell the truth. Id. at 144.

We are mindful that Lara's counsel did not object. Although Lara contends there is no record that her counsel had advance notice of the interview, or an opportunity to submit questions, the judge may have proceeded the way she did with the parties' consent. However, we held in C.W. that notwithstanding "apparent acceptance of the process," the Division was obliged to show that the defendant "was given a sufficient opportunity to confront the Division's evidence in light of the interview procedures followed by the judge." Id. at 145. "The analysis is twofold: was [the defendant] prejudiced by the procedure utilized, and did the Division's other evidence satisfy its burden of proof." Ibid. We reject the Division's contention that C.W. applies only to the fact-finding hearing. The C.W. court rested its conclusion on the due process right to a "measure of confrontation" in civil cases. Ibid. (quoting A.B. v. Y.Z., 184 N.J. 599, 605 (2005)). This right is as important in a dispositional hearing, as it is in a fact-finding hearing.

In the light of the hearing that followed Nina's interview, we are convinced that Lara was prejudiced by the procedure, and the other evidence did not satisfy the Division's burden of proof. A child's preferences should not be determinative, particularly given the possibility of parental influence. Wilke v. Culp, 196 N.J. Super. 487, 498 (App. Div. 1984). The court heard no other

testimony at the May 17, 2016 hearing. The reports from Nina's school and therapist did not express an opinion that visitation should be suspended. Aside from conveying Nina's opposition to visitation, the child interview was uninformative. The court elicited few details regarding Nina's experience in the visitation sessions; how her mother acted and what she said; and how Nina responded. Nina gave disjointed answers to some questions, and was prodded by leading questions that produced answers of questionable reliability. Nina did not clearly explain why visitation was so distasteful or upsetting. Her explanation that her mother was "disappointing" was unclear. She also did not coherently or consistently discuss any influence exerted by her father.

"Not only do parents have a constitutional right to enjoy a relationship with their children, children likewise have the right to visit with their parents after they have been removed from the parent's home." S.M. v. K.M., 433 N.J. Super. 552, 558 (App. Div. 2013) (internal citations omitted). This remains true "even if the child[] verbalize[s] a desire not to see the parent." Ibid. Before suspending visitation, the court was required to find, by clear and convincing evidence, that suspension was necessary to shield Nina from harm. See V.C., 163 N.J. at 229; see also Wilke, 196 N.J. Super. at 503 (holding that a "father's visitation rights should not have been denied unless it clearly and convincingly

appeared that this was one of those exceptional cases where visitation would have caused physical or emotional harm to the children, or where it was demonstrated that the noncustodial parent was unfit").

The court made no such finding. Indeed, the court's colloquy with counsel reflects that the evidence was far from clear and convincing. The judge was about to continue visitation, until the Law Guardian proposed a temporary cessation until the end of the school year.

In New Jersey Division of Youth & Family Services v. G.M., 198 N.J. 382 (2008), the Supreme Court criticized the informality of dispositional hearings that followed a fact-finding hearing. The court cited "the lack of sworn witnesses, the failure to introduce documentary evidence, [and] the failure to call expert witnesses." Id. at 402. The same critique applies here. The court identified, but did not resolve, the critical factual issue presented by the positive report of the visitation therapist, and reports of Nina's individual therapist. Despite indications of possible interference by Fred, that issue was not pursued. These factual issues could only be properly resolved at a plenary hearing, at which the therapists, among others, could testify.

The court's decision to continue the suspension of visitation, when it terminated the Title 9 litigation a month and a half later, suffered from the same

shortcoming. After the end of the school year, the court relied on the hearsay report of the Law Guardian and the Law Guardian's investigator regarding Nina's behavior during the suspension of visitation. The investigator's interviews disclosed that Nina's misbehavior continued, despite the suspension of visitation. The IEP report did not paint a different picture. In sum, the evidence fell short of clear and convincing that the suspension had a significant, positive influence on Nina's behavior.

Therefore, we are constrained to reverse the trial court's June 30, 2016 order. The error is not the court's decision to terminate Title 9 litigation at the end of a dispositional hearing. The error is the failure to make an appropriate finding, based on clear and convincing evidence, after a plenary hearing, that an indefinite suspension of Lara's visitation was necessary to shield Nina from harm.

Affirmed as to the orders of January 8 and June 3, 2013. The order of June 30, 2016 indefinitely suspending visitation and terminating the Title 9 litigation is reversed. The matter is reopened for the purpose of conducting a plenary hearing on the matter of visitation, and, thereafter, entry of an appropriate order on visitation, in conjunction with termination of the Title 9

litigation.  The court shall conduct a case management conference within thirty days.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5333-15T4