798 A.2d 673 (2002)
351 N.J. Super. 427
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
Z.P.R. and W.R., Defendants-Respondents,
In the Matter of W.A.R., I.D.R., and N.D.P., Minors-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued May 28, 2002.
Decided June 13, 2002.
*674 Phyllis G. Warren, Trenton argued the cause for appellants (Peter A. Garcia, Acting Public Defender, attorney; Ms. Warren, of counsel and on the brief).
Erin O'Leary, New Brunswick, argued the cause for respondent, Division of Youth and Family Services (Peter C. Harvey, Acting Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Ms. O'Leary, Deputy Attorney General, on the brief).
Sara K. Walsh argued the cause for respondent Z.P.R. (Ms. Walsh, Staff Attorney, Legal Aid Society of Mercer County, of counsel and on the brief).
Before Judges HAVEY, COBURN, and WEISSBARD.
The opinion of the court was delivered by WEISSBARD, J.A.D.
Minor children, W.A.R., born December 26, 1996, and I.D.R., born April 17, 1998, by their Law Guardian, appeal from an order of the Family Part dismissing an amended complaint filed by the Division of Youth and Family Services ("DYFS"), insofar as it alleged that the children had been abused or neglected, pursuant to N.J.S.A. 9:6-8.21 to -8.73, by their mother, Z.P.R.[1] We reverse and remand for further proceedings.
On March 20, 2001, Z.P.R. and W.R. signed a fifteen day informed consent to place their sons, W.A.R. and I.D.R., in foster care or with a relative due to unstable housing.[2] In March 2001, DYFS placed W.A.R. and I.D.R. in the same foster *675 home. On June 1, 2001, their foster mother, Mrs. M., called DYFS and reported that she witnessed I.D.R. performing fellatio on W.A.R. and that she wanted the boys removed from her home within two weeks. On June 3, 2001, W.A.R. told Mrs. M. that he learned this behavior from his mother Z.P.R. On June 5, 2001, DYFS caseworker A.W.S. visited Mrs. M.'s home; afterwards, A.W.S. filed a referral in which she stated that W.A.R. told her that Z.P.R. "licked his private area" and I.D.R.'s private area as well.
DYFS notified the Mercer County Prosecutor's Office and the Trenton Police Department, who conducted an investigation; however, Trenton Police closed its case when it was unable to get a disclosure from either W.A.R. or I.D.R. concerning the sexual abuse allegations.
On June 17, 2001, W.A.R. was removed from his first foster home and placed in Mrs. W.'s therapeutic foster home. On June 19, 2001, DYFS made a referral through Prevention Education for a sexual abuse assessment of W.A.R. and I.D.R.[3] I.D.R. was placed at Angel's Wings on June 20, 2001 and was moved to a second foster home on August 21, 2001. On August 31, 2001, Z.P.R. gave birth to N.D.P. and signed a fifteen day informed consent form that same day to place N.D.P. into foster care or with a relative. Z.P.R. subsequently revoked the consent forms for N.D.P., W.A.R., and I.D.R.
On September 11, 2001, DYFS filed a verified complaint requesting custody of W.A.R., I.D.R., and N.D.P. DYFS was granted custody of the three children on September 13, 2001. At that time, the court ordered that W.A.R. and I.D.R. be evaluated by Dorothy B. Hersh Regional Child Protection Center ("CPC") or Dr. Kathryn Hall, a leading psychologist based in Princeton, and that their sexual abuse counseling at Prevention Education be discontinued until further order of the court. The court also ordered DYFS to make an inspection of Z.P.R.'s apartment to assess whether N.D.P. could be returned to her. On September 24, 2001, Z.P.R. requested increased visitation with her children, which the judge granted. At that time, the boys had not been evaluated, so the court ordered that W.A.R. and I.D.R. be evaluated within "the next 2 weeks either at CPC or [by] Kathryn Hall." Z.P.R. agreed to a psycho-sexual evaluation.
On October 5, 2001, a foster sister in W.A.R.'s second foster home reported to the foster mother Mrs. W. that she observed sexual activity between W.A.R. and another foster brother, H. Specifically, Mrs. W. stated that she heard A., a 10-year-old foster child living in the home, scream that H. was on top of W.A.R. Mrs. W. stated that she rushed upstairs to where the boys were and saw them in their underwear. H. told a caseworker that as he and W.A.R. were putting on their pajamas, W.A.R. told H. to get on top of him. H. stated that W.A.R. told him that W.A.R. "had sex with his [W.A.R.'s] mother." "`This worker asked H., `did you and W.A.R. have sex?' He said, `no, we fake it, but W.A.R. said it's like what he do with his mother.'"
On October 10, 2001, DYFS completed a referral response report in regards to this incident. W.A.R. reported to a caseworker that he learned such behavior from his *676 mother. That same day, October 10, DYFS requested an emergent hearing because neither Dr. Hall nor CPC could perform evaluations of W.A.R. and I.D.R. by the court-ordered October 25 deadline. At that time, the court scheduled a fact-finding hearing for October 16, 2001 because Z.P.R. wanted her children back. At the request of DYFS and the Law Guardian, the October 16 hearing was adjourned, but eventually took place on October 23, 30, and November 14, 2001. The Law Guardian interviewed W.A.R. in camera in the presence of the judge; W.A.R. reported no abuse during this interview. Z.P.R. testified on her own behalf, denying the allegations.
On November 14, 2001, the judge ruled that there was insufficient evidence to sustain a finding that Z.P.R. sexually abused her children. The Title 9 portion of the complaint was dismissed, and the children remained in DYFS' custody pursuant to Title 30. Therapy and counseling were ordered, and the court ruled that DYFS would follow its procedure "to ensure that there is suitable housing for the children." The trial judge also reinstated visitation between Z.P.R. and her children. Although there were further hearings and rulings in connection with the Title 30 matters, they are not relevant to the issues before us, all of which arise from the fact-finding hearing dealing with the abuse allegations.
On appeal the Law Guardian raises the following issues:
POINT I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO RECOGNIZE THAT THE INAPPROPRIATE SEXUAL BEHAVIOR AND KNOWLEDGE OF [W.R.] AND [I.D.R.] CORROBORATED THE CHILDREN'S OUT OF COURT DISCLOSURES OF SEXUAL ABUSE.
POINT II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REJECTING AS UNRELIABLE THE THREE OUT-OF-COURT DISCLOSURES OF ABUSE AND ACCEPTING AS TRUE THE IN CAMERA DENIAL OF SEXUAL ABUSE.
POINT III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO ALLOW THE DIVISION'S EXPERT TO TESTIFY AT THE NOVEMBER 14, 2001 HEARING.
Although phrased slightly differently, DYFS also seeks reversal based upon the same contentions.

I
In addressing the first issue, it must be emphasized that the trial judge did not reject the out-of-court statements made by W.A.R. or I.D.R.; those statements were admitted and obviously weighed by the judge. However, N.J.S.A. 9:6-8.46a(4) provides that in any hearing under the statute, "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." (emphasis added). The Law Guardian, joined by DYFS, asks us to determine that the trial judge, sitting without a jury, should have found sufficient corroboration of the children's out-of-court statements in their age-inappropriate behavior itself. Such a request misperceives our appellate function in these matters.
In Rova Farms Resort, Inc. v. Investors Insurance Co. of America, 65 N.J. 474, 484, 323 A.2d 495 (1974), the Court adopted the standard of review for non-jury determinations set forth in Fagliarone v. Township of North Bergen, 78 *677 N.J.Super. 154, 155, 188 A.2d 43 (App.Div. 1963):
`[O]ur appellate function is a limited one: we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'
Thus, "[f]indings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495 (citing New Jersey Turnpike Authority v. Sisselman, 106 N.J.Super. 358, 255 A.2d 810 (App.Div.), certif. denied, 54 N.J. 565, 258 A.2d 16 (1969)); see also State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964); State in Interest of L.E.W., 239 N.J.Super. 65, 76, 570 A.2d 1019 (App.Div.), certif. denied, 122 N.J. 144, 584 A.2d 216 (1990). It is improper for us "to engage in an independent assessment of the evidence as if [we] were the court of first instance." State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999).
Nevertheless, the trial judge's findings are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles. See Manalapan Realty, L.P. v. Tp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). In this case, the record leaves us in doubt as to whether the judge properly applied the concept of corroborating evidence under N.J.S.A. 9:6-8.46a(4), notwithstanding his otherwise painstaking review of the evidence, both documentary and testimonial. The court's ultimate finding, in pertinent part, was as follows:
The Court accepts all of the different testimony and the reports made by the Division and accepts the fact that [W.A.R.] said that his mom showed him this. The question then becomes, when you look at the statute, it goes on to say, those statements are admissible as evidence. It goes on to say, provided, however, that no such statement if uncorroborated shall be sufficient to make a fact finding of abuse or neglect.
And the problem we have in this case, ladies and gentlemen, the Court cannot draw what I would say is []reliable inferences in this case. There is no other corroborating evidence. Whether you like it or not, there is nothing there. There is nothing independent of what [W.A.R.] says that goes directly to [Z.P.R.]'s involvement in sexual assault with her children. All we have here are the statements of [W.A.R.] being repeated to at least three or four individuals with nothing else.
That being the case, the Court has no choice under the statutethe Court cannot make a finding of abuse or neglect under the statute. There is no corroborating evidence to be considered by the Court. Even if the Court were to consider the in camera interview, which, quite frankly, again, if nothing else, certainly in the Court's view put in doubt, put in question the initial statements made by [W.A.R.]. And the Court had the opportunity to observe [W.A.R.] in the interview and he avoided eye contact. But when asked certain questions about his mother's involvement, he didn't hesitate. He was unequivocal. He said, no, mommy didn't. When I asked him whether or not mommy licked you down thereand the Court could refer to the transcripthe said no.
While the court's finding that there was a lack of corroboration could mean that the court considered all the evidence in the case, including the sexual acting-out activity, as available for corroboration but was *678 simply not persuaded by it, the court's comments must be viewed against other statements made during the arguments leading up to the final decision. At various points, the court made the following observations:
THE COURT: It may be sort of esoteric, but the problem with this case is that we're talking about an actual sexual acting out incident that was observed by foster parents. From there, the kid allegedly said, well, mommy does this. Well, whatever mommy does, we don't have any corroborating evidence to support that. We don't know what it is that mommy does. We don't know.
* * *
THE COURT: Talk to me about the additional corroboration that you are suggesting has been produced at this trial.
COUNSEL: The Division's position is that the acting out sexually that [W.A.R.] has exhibited, namely by having [I.D.R.] perform fellatio on him and the humping incident, that that is corroboration of the statements he had made regarding the sexual abuse.
THE COURT: You'reno, no, you're missing it, [Counsel]. What you have to have corroboration is of the mother's misdoing. Where is that corroboration? For the sake of argument, the Court accepts what has been said by [W.A.R.]. Forget about what happened in camera. The Court accepts that. Where is the corroboration of mom's misdeeds? Where is it?
COUNSEL: I think it's that a normal four year old does not exhibit this behavior.
THE COURT: Where is the evidence, corroboration? Where is it?
Earlier, during summations, the court commented:
THE COURT: I think that we all agree and admit that the incidents happened. The question really is in this case is whether or not the sexual acting out can be attributed to the mother in this case. I think we all agree that these acts happened and were observed. The question in my mindand I just want to narrow your focus somewhatis that the question is given all that has happened, given what was said in the interviews, whether or not I can make a finding that all of this was the result of the mother's involvement or her responsibility one way or the other that the children learned these acts directly from her.
If, as the Law Guardian and DYFS suggest, those comments reflect an understanding by the judge that corroboration of child sexual abuse must be offender-specific, we do not agree. It would be a rare case where evidence could be produced that would directly corroborate the specific allegation of abuse between the child and the perpetrator, in this case the mother. The case law does not require that the evidence be that specific before it can be deemed corroborative of the child's out-of-court statements. In State v. Swan, 114 Wash.2d 613, 790 P.2d 610, 615-16 (1990), cert. denied, 498 U.S. 1046, 111 S.Ct. 752, 112 L. Ed.2d 772 (1991), the court addressed the difficulties which support the admission of age-inappropriate sexual behavior as corroborative of sexual abuse:
The most effective types of corroboration in such cases, of course, are eyewitness testimony, a confession or admissions by the accused, and medical or scientific testimony documenting abuse. In most cases of child sexual abuse, however, there is no direct physical or testimonial evidence. The child victim is *679 often the only eyewitness to the crime, and physical corroboration is rare because the sex offenses committed against children tend to be nonviolent offenses such as petting, exhibitionism, fondling and oral copulation. Physical corroboration may also be unavailable because most children do not resist, either out of ignorance or out of respect for authority. Consequently, in order to give any real effect to the child victim hearsay statute, the corroboration requirement must reasonably be held to include indirect evidence of abuse. Such evidence has included a child victim's precocious knowledge of sexual activity, a semen stain on a child's blanket, a child's nightmares and psychological evidence.
In that case, the court approved the admission of "precocious sexual knowledge," id. at 620, as well as "abnormal and sexualized behavior as corroborative of children's hearsay statements regarding abuse." Id. at 621; see also Adoption of Arnold, 50 Mass.App.Ct. 743, 741 N.E.2d 456, 464, review denied, 434 Mass. 1102, 751 N.E.2d 419 (2001); Matter of Tracy V. v. Donald W., 220 A.D.2d 888, 632 N.Y.S.2d 697, 698 (1995); Matter of Guy UU, 200 A.D.2d 852, 606 N.Y.S.2d 830, 831 (1994). It is well accepted that such age-inappropriate behavior is one of the behavioral signs associated with child sexual abuse. State v. J.Q., 130 N.J. 554, 563-64, 617 A.2d 1196 (1993). In State v. D.R., 214 N.J.Super. 278, 298, 518 A.2d 1122 (App.Div.1986), rev'd on other grounds, 109 N.J. 348, 537 A.2d 667 (1988), we noted as one of the facts militating in favor of the reliability of out-of-court statements of child sex abuse victims was "the child's exhibiting knowledge of sexual practices beyond her reasonably anticipated imagination[.]"
Thus, we have no doubt that evidence of age-inappropriate sexual behavior could provide the necessary corroboration required by N.J.S.A. 9:6-8.46a(4). The corroborative evidence need not relate directly to the alleged abuser, it need only provide support for the out-of-court statements.
We are not holding, as DYFS and the Law Guardian would have us do, that the behavior of the children in this case sufficiently corroborated the out-of-court statements as to justify a finding of sexual abuse. To do so would arrogate to us the role of the trial judge as fact-finder. We remand the matter because we are left in doubt as to whether the judge fully appreciated the role of the sexual acting-out as possible corroborative evidence. It will still, of course, be up to the judge to weigh all of the evidence, make determinations as to credibility and weight of that evidence, and come to a final determination as to whether the allegation of abuse has been proven by a preponderance of the evidence. We have every confidence that the able trial judge, who engaged in a careful review of the evidence, will be able to reconsider his decision in light of the views expressed herein, notwithstanding his prior determination. Except as discussed in Point III, the judge need not hear additional testimony but should, of course, permit further argument in light of this opinion.

II
The Law Guardian and DYFS also argue that the trial judge erred in finding W.A.R.'s in camera testimony to be more persuasive than the out-of-court statements attributed to him. At the outset we reject the suggestion that the trial judge should not have interviewed W.A.R. at all. Such an interview was clearly within the court's discretion. We also note that it was not the judge who questioned W.A.R. *680 at the hearing but his own attorney, the Law Guardian.
The detailed and lengthy attack mounted by both the Law Guardian and DYFS on the court's assessment of the in camera interview completely ignores the standard of review to which we have referred earlier. The question of the credibility of W.A.R.'s out-of-court statements vis-a-vis his testimony at the in camera hearing was particularly appropriate for resolution by the trier of fact who has the "opportunity to hear and see the witnesses and to have the `feel' of the case, which a reviewing court cannot enjoy." Johnson, supra, 42 N.J. at 161, 199 A.2d 809. Accordingly, we reject this argument.

III
Finally, the Law Guardian and DYFS both complain of the trial judge's decision not to entertain testimony from either of two experts concerning the Child Sexual Abuse Accommodation Syndrome ("CSAAS") as it related to W.A.R.'s failure during the in camera interview to provide evidence of sexual abuse by Z.P.R. consistent with his reported out-of-court statements. We have held such evidence admissible "to explain secrecy, belated disclosure and recantation by a child sex abuse victim" but not "to prove that sex abuse, in fact, occurred[.]" State v. J.Q., 252 N.J.Super. 11, 43, 599 A.2d 172 (App. Div.1991), aff'd, 130 N.J. 554, 617 A.2d 1196 (1993).
In this case Dr. Hall, an acknowledged expert in the field, not only commented in her report to the Law Guardian on why W.A.R. did not, in the in camera interview, confirm sexual abuse by his mother as stated in his out-of-court statements but also opined that "the sexual acting out behavior he has engaged in is a very strong indicator that he has been exposed to sexually inappropriate behavior." She concluded that "[g]iven his behavior and the nature of the disclosure process in sexually abused children, I would have strong reason to doubt the reliability of [W.A.R.]'s statement [in the in camera interview]." Dr. Hall was unavailable to testify at the hearing.
Dr. Sigafoos, DYFS's expert, actually reviewed a transcript of the in camera interview and concluded as follows:
This preliminary review of a court transcript, given the content in which it was conducted and the numerous factors impinging on the interview of a young child, all indicate the child's report was inaccurate and influenced by multiple factors, the more significant of which lie outside the control of the child.
In order to provide testimony [as to the] psychological condition of a particular individual, that individual will need to be examined, tested and the results analyzed, informers interviewed, documents reviewed and a report prepared. A sufficient amount of time will be needed to accomplish this.
DYFS requested a continuation of the hearing for the purpose of having Dr. Sigafoos, who was available to testify, conduct an evaluation of W.A.R. The judge denied that request.
Our review of the record persuades us that the trial judge was fully aware of the purposes of CSAAS evidence, including its use to explain recantation, which we assume was the thrust of the proffered evidence here. Indeed, it has been conceded that the judge read the reports of both Dr. Hall and Dr. Sigafoos. Nevertheless, the trial judge determined that the evidence would not be helpful to him in resolving the case, particularly since neither expert had examined W.A.R., while the judge himself had the opportunity to *681 see and hear the child responding to questioning in camera.
Under N.J.R.E. 702, expert testimony is admissible if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Whether acting with a jury or without a jury, the judge is the gatekeeper with respect to expert evidence. As the rule itself says, one of the key components of admissibility is whether the testimony "will genuinely aid" the trier of fact. State v. Odom, 116 N.J. 65, 71, 560 A.2d 1198 (1989). We see no reason why these same principles do not apply in a non-jury case. A judge sitting on a bench trial is in the best position to determine if expert testimony on a particular issue will assist that judge. See Wilkerson v. Pearson, 210 N.J.Super. 333, 509 A.2d 818 (Ch.Div.1985). Here, we are satisfied that the trial judge "was fully aware of the factual and legal issues raised, and had the ability to make reasoned decisions concerning what was relevant and what was not." State v. Krivacska, 341 N.J.Super. 1, 36, 775 A.2d 6 (App. Div.), certif. denied, 170 N.J. 206, 785 A.2d 435 (2001), cert. denied, ___ U.S. ___, 122 S.Ct. 1594, 152 L.Ed.2d 510 (2002).
We find no error warranting reversal in the trial judge's refusal to entertain the expert evidence of CSAAS. Clearly, the judge's determination subsumed a finding that the evidence would not be of assistance to him under the circumstances of this case. Nevertheless, because the matter must be remanded, we do not foreclose the trial judge from reconsidering his ruling and, in the interest of having as complete a record as possible in this difficult and serious matter, permitting Dr. Sigafoos to evaluate W.A.R. and, if appropriate in light of any supplemental reports filed thereafter, to testify concerning his findings, as well as about his opinions on the reliability of the in camera interview. We leave these matters to the trial judge's sound discretion.
Reversed and remanded for further proceedings not inconsistent with this opinion.
NOTES
[1] That aspect of the complaint which sought relief under Title 30, N.J.S.A. 30:4C-13, which was not dismissed, is not involved in this appeal.
[2] Z.P.R. had another child, S.J.P. born on July 20, 2000, to T.A. S.J.P., who is not the subject of this litigation, was placed in the care of his paternal grandmother, S.W., who received legal custody of S.J.P. on March 9, 2001.
[3] Both boys attended three sessions with Prevention Education counselors; however, the sessions were discontinued by a September 13, 2001 court order.