# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0470-17T1

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

S.B.,

     Defendant-Appellant,

and

M.H. and H.A.,

     Defendants.

_____

IN THE MATTER OF C.A., CH.A.,
K.A., R.A., and M.B., minors.

_____

Argued October 2, 2018 – Decided  December 7, 2018

Before Judges Rothstadt, Gilson and Natali.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0284-17.

Andrew P. Slowinski, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Anastasia P. Winslow, Designated Counsel, on the briefs).

Lisa J. Rusciano, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Michelle F. Mikelberg, Deputy Attorney General, on the brief).

David B. Valentin, Assistant Deputy Public Defender, argued the cause for minors C.A., CH.A., K.A., R.A. and M.B. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; David B. Valentin, on the brief).

PER CURIAM

Defendant S.B.[1] appeals from the Family Part's June 28, 2017 fact-finding order that determined his paramour's daughter was an abused or neglected child, as defined by N.J.S.A. 9:6-8.21(c)(3), after the trial court found that defendant had sexually abused the child. He also appeals from the court's August 18, 2017 order terminating the litigation, but requiring that his contact with his daughter be supervised in a "FD" non-dissolution matter.

---

[1] To protect privacy interests and for ease of reading, we use initials and fictitious names. See R. 1:38-3(d)(12).

In finding that defendant sexually abused his girlfriend's daughter, the trial court relied upon the non-testifying child's out-of-court statements describing the abuse, an admission by defendant that he had contact with the child on occasions identified by the child, and the child's mother's and brother's testimony describing certain behavior that the child explained was directed at making sure she was not alone with defendant. On appeal, defendant contends that there was insufficient credible evidence in the record to support a finding of abuse, primarily because the child's out of court statements were not corroborated as required by N.J.S.A. 9:6-8.46(a)(4). He also argues that plaintiff New Jersey Division of Child Protection and Permanency's (Division) expert witness was not qualified in the area of child sexual abuse. Defendant also asserts that his due process rights were violated because the Division failed to provide him with adequate notice of its evidence against him. Finally, he challenges the trial court's decision to require his contact with his biological daughter to be supervised and that an action under an FD docket be filed to monitor their interaction. For the reasons that follow, we affirm.

I.

The facts developed at the fact-finding hearing are summarized as follows. Defendant is the paramour of M.H. (Maria). Prior to dating defendant, Maria

3                                                                          A-0470-17T1

had five children with her former husband, H.A. (Henry): (1) fourteen-year-old C.A. (Charles); (2) thirteen-year-old K.A. (Kelly); (3) ten-year-old R.A. (Robert); (4) five-year-old C.A. (Connor); and (5) an adult son who was not involved in this case. Maria and defendant have one child together, a daughter, three-year-old M.B. (Melissa).[2]

The allegations in this case relate to defendant's alleged sexual abuse of Kelly, who was born in 2003. Kelly lived in an apartment with her mother, defendant, Charles, Robert, Connor, and Melissa. The apartment has three bedrooms—one for defendant and Maria; one for Charles; and one for Kelly. Sometimes Melissa slept with Kelly in her bedroom. Otherwise, Robert, Connor, and Melissa slept in the living room.

On October 28, 2016, the Division received a referral after Kelly told her school's social worker that defendant had been inappropriately touching her on her chest and buttocks. As a result, Division caseworker Kerlyn Murat interviewed Kelly. The child told Murat that defendant had been inappropriately touching her over her clothes and pointed to her chest and crotch. She said that the touching happened on numerous occasions either while she was washing

---

[2] Defendant has five children from another relationship who live with their mother in New York. Those children are not part of this action.

A-0470-17T1

dishes or sleeping in her room. For that reason, she would try to sleep in Charles' bedroom to avoid defendant coming into her bedroom. Kelly also said that when she told Charles that defendant touched her, he said to her that she must have been "dreaming."

Kelly also told Murat about another instance of sexual abuse, unrelated to defendant. Specifically, she said she was "raped" by a friend of the family when she was six years old. Kelly stated that "raped" is "when someone has sex with you," but when Murat asked Kelly to define sex, she stated she did not know how to describe it. Kelly said she told her mom about the rape when she was six years old, that her mother cried and gave her a bath, and that her father went to his room.

That same day, Murat interviewed Maria. After Murat told Maria about the allegations of sexual abuse, Maria said she noticed that recently Kelly had been "looking a little sad," which she attributed to Kelly and her brother fighting. Maria said that Kelly liked to stay in her brother's room and that Kelly would fight with her brothers or cry when she was told to go to her own room. When asked if Kelly had ever been sexually assaulted, Maria recalled an incident when one night she returned home and found her then-husband, Henry, and another man sleeping after they had been drinking. Maria said that Kelly told her the

5

next morning that the man touched her. Maria also said she cried when Kelly told her. Murat told Maria about Kelly's allegations of sexual assault against defendant, which Maria found "hard to believe" because defendant was always working.

Murat also spoke with defendant and told him that there was an investigation regarding the safety of the children and asked whether he was willing to leave the family's apartment while the investigation was ongoing. Defendant asked about the nature of the allegations, and Murat explained she was unable to discuss the details at that time. Ultimately, Maria and defendant entered into a safety protection plan with the Division in which they both agreed that defendant would leave the apartment.

Murat and another Division caseworker went to the family's apartment to conduct a home assessment and speak with the other children. Notably, Charles said that Kelly never told him about defendant touching her and that he had never observed anyone touch Kelly inappropriately. In a subsequent interview on another day, Charles also told Murat that Kelly tried to sleep in his bedroom on several occasions and that she wanted to play his video games in his room. Murat did not include her second discussion with Charles in her investigative report.

A-0470-17T1

Murat later interviewed Henry, who explained that Maria had already told him about the allegations against defendant. Henry denied knowing anything about the alleged sexual abuse of Kelly when she was six years old.

On December 5, 2016, Murat and another caseworker interviewed defendant. Murat told defendant that Kelly alleged he had been inappropriately touching her. Defendant denied ever intentionally touching Kelly in a sexual manner. However, he spontaneously disclosed two instances when he accidentally touched her. First, he recalled that approximately two months prior, Melissa started crying while she was lying in bed with Kelly. Defendant said that when he went to "scoop" Melissa up, he may have touched Kelly with his arm by accident. Second, he told Murat that one day he was in the kitchen while Kelly was washing dishes, and he brushed against Kelly to reach for something.

As part of the Division's investigation, Kelly was evaluated by Daisy Rimli, a licensed social worker at the Metropolitan Regional Diagnostic and Treatment Center (RDTC).[3] Kelly told Rimli the same version of events

---

[3] RDTCs were established by the Commissioner of Children and Families, pursuant to N.J.S.A. 9:6-8.99. Each RDTC "shall demonstrate a multidisciplinary approach to identifying and responding to child abuse and neglect. The center staff shall include, at a minimum, a pediatrician, a consulting psychiatrist, a psychologist and a social worker who are trained to evaluate and treat children who have been abused or neglected and their

regarding the sexual abuse as she told to Murat, stating defendant touched her breasts, vagina, and buttocks, while she was washing the dishes or while her mother was not looking and for that reason, she did not want to be alone while doing dishes or sleeping in her room. To avoid defendant's touching, Kelly said that she would often ask one of her brothers to "sit and watch" her in the kitchen while she washed the dishes. She also said she would "cry" when she had to wash the dishes. Kelly also told Rimli that she decided to report the sexual abuse because she felt "scared" after an incident when she was sleeping in Charles' room and woke up to defendant rubbing her thigh. She described how she felt his beard on her neck, and she pretended she was still sleeping. Kelly said that when she told Charles and Robert about the incident, they told her she "must've been dreaming." She also described to Rimli the incident of sexual abuse that occurred when she was six years old.

Rimli found that Kelly was very concerned with Maria's disbelief of the sexual abuse allegations and Maria's lack of support. Kelly told Rimli that she did not disclose the abuse earlier because she thought her mother would get mad at her. She also said that Maria "blamed" Kelly for the sexual abuse by

families." N.J.S.A. 9:6 8.100. One of the services provided by RDTC staff is "[p]roviding testimony regarding alleged child abuse or neglect at judicial proceedings[.]" N.J.S.A. 9:6 8.102.

defendant because she did not tell her earlier. Rimli found that Maria "was open about her ambivalence regarding [Kelly's] disclosure" and maintained that she had never witnessed any abuse. Maria's lack of support was of concern to Rimli. Maria confirmed to Rimli Kelly's behaviors relating to her becoming upset if left alone to do the dishes and trying to sleep in her brother's room. Ultimately, Rimli diagnosed Kelly with "Child Sexual Abuse, Confirmed, Initial Encounter" and recommended that she receive "trauma focused" therapy. She also recommended that Kelly "be referred for a Mentor to provide her with a positive support system."

Based on the interviews of Kelly and her family members and Rimli's evaluation, Murat concluded that the allegation of sexual abuse against defendant was substantiated. She found that Kelly's statements were credible based, in part, upon their consistency and corroborated by her mother and Charles. Specifically, Maria stated that Kelly tried to stay in Charles' bedroom and would cry when she had to return to her own bedroom or when she did the dishes. Charles also confirmed that Kelly tried to sleep in his bedroom on several occasions.

The Division filed a verified complaint for care and supervision of Charles, Kelly, Robert, and Connor and for custody of Melissa. On December

14, 2016, the court entered an order restricting defendant's contact with the children and directing that the parties comply with the existing safety protection plan that prohibited defendant from occupying the family's apartment while the investigation was ongoing. Additionally, the court transferred sole physical custody of Melissa to Maria and directed that all of defendant's contact with her had to be supervised by Maria in a public place and without the other children.

The court conducted a fact-finding hearing as required by N.J.S.A. 9:6-8.44 on June 28, 2017. All of the parties were represented by counsel. After being qualified as an expert in child maltreatment and sexual abuse, Rimli testified about her findings as to Kelly and Murat testified on behalf of the Division about her investigation, interviews, and the conclusions reached by the Division. Defendant did not testify or call any witnesses to testify. In addition to Murat's and Rimli's testimony, Murat's investigation summary, Rimli's evaluation report and curriculum vitae, and Kelly's certified school records were admitted into evidence.

When the Division offered Rimli as an expert, defendant's counsel objected, arguing that Rimli's counseling experience was not specific to sexual abuse and that she had not published or coauthored any materials regarding sexual abuse. The court rejected defendant's challenge, finding that N.J.R.E.

703 does not require publication or coauthoring for a witness to be qualified as an expert. Moreover, the court highlighted Rimli's ten years of experience in counseling children and families and her more recent focus on sexual abuse, as well as that she has been qualified as an expert in this area before and has received specific training on how to evaluate children in such cases.[4]

Murat testified after Rimli. Notably, during her cross-examination, Murat testified about the second interview she conducted of Charles that was not in the investigative report. She clarified that during the second interview, Charles stated that Kelly wanted to stay in his room to play video games. Murat also explained that she was told by Maria that Charles and Kelly often fought and

---

[4] Rimli testified to her credentials and explained that she has both a Bachelor's and a Master's degree in social work. She has been providing individual and family counseling services for ten years, most recently through her employment with the Family Life Education Center at Newark Beth Israel Medical Center. Her duties include conducting psychosocial evaluations, providing individual therapy and parenting groups, and giving outreach presentations. She is trained in the area of child abuse trauma. In particular, she observed the Finding Words training, which instructs on how to conduct interviews of children alleging abuse. Over the course of her career, she has presented or given lectures on parenting, domestic violence, and teen dating abuse. She has conducted over one hundred and twenty psychosocial assessments and provided therapy to over one hundred and fifty children and families, ranging from age four to adult. Ms. Rimli has testified as an expert in child maltreatment and sexual abuse four times. She has not written any articles or publications on child sexual abuse.

that their disputes resulted in Kelly crying when she was forced to separate from her brother.

At the conclusion of the hearing, the court issued an order and placed on the record an oral decision finding that the Division had proven by a preponderance of the evidence that defendant had abused Kelly. In addition to Kelly's statements, the court found Rimli's and Murat's testimony to be credible, compelling, and persuasive. The court also noted that Kelly's statements since the start of the investigation were consistent. The court concluded that Kelly's out-of-court statements regarding the alleged sexual abuse were corroborated, as required under N.J.S.A. 9:6-8.46(a)(4), by Maria's and Charles' statements about Kelly's behavior, as well as defendant's admission to Murat that he recalled touching Kelly two times. As to defendant's admission, the court questioned why if the two incidents of his accidentally touching Kelly were so innocuous, they were readily recalled by defendant. The court stated:

> What's, also, important to this [c]ourt are her statements about being afraid and sleeping -- being afraid and the result that she needed to sleep with her brother. Those are the indirect corroborative statements that are important. That this was in some respects independently corroborated by her mother. Because her mother was saying that she would cry when she didn't get to sleep with her father -- with her brother. The brother said she didn't -- she was upset when she didn't get to stay with him.

When she was told she had to go into her own bedroom she started to cry. This was a version that she had told. It was, in part, corroborated by the mother and in part corroborated by the brother.

But I have to say . . . what is particularly important to this [c]ourt, was the admission by [defendant] himself when confronted with these allegations he brought up two -- he immediately brought up two accidental incidents. Oh, it must have been the time when -- when I was picking up [Melissa]. Oh, it must have been the time when [Kelly] was washing dishes.

This [c]ourt finds that his version of those events and his characterization of those events was simply incredible, and suspiciously convenient. Those aren't versions -- those aren't events that [Kelly] brought up. Because, again, admittedly there was not a great deal of detail. There was not a great deal of questioning about when things happened, how long they took, what day, what time. But when confronted [defendant] had two -- two accidental moments that, obviously, meant something to him. And those . . . statements, this [c]ourt finds to be particularly corroborative of [her] version of events.

Relying on the expert testimony, the court found that the abuse clearly caused harm to Kelly. Specifically, the court found that Kelly had experienced distress and suffering and had been crying and upset. The court also concluded that absence of behavioral or other problems at school did not suggest that the abuse did not occur. Rather, the court credited Rimli's testimony that children

13

react differently to sexual abuse, and that some children "try to become the perfect child[.]"

The trial court rejected defendant's argument that Kelly's emotional distress was a result of alleged abuse she suffered when she was four or six years old. It found that earlier abuse "could be responsible for some of the feelings [Kelly] has now[,] [a]nd in the absence of any other evidence that would be persuasive. But . . . there is ample evidence upon which to base a finding of abuse and neglect [against defendant]."

On July 27, 2017, defendant's attorney wrote to the court to confirm that the parties agreed to the entry of an order providing defendant with only "supervised contact with [Melissa]." The letter stated:

> [Defendant is] no longer a couple with the mother[,] not interested in being reunified at the family residence, [and] understands that by not agreeing to do any services, a protective order may be put in place by the court, stating that he cannot have any unsupervised contact with [Melissa], that he cannot live at the family residence, and that he is not to have any contact with [Maria's children]. [Defendant] is fine with the court putting such a protective order in place to terminate the matter from litigation . . . ."

At a review hearing held on August 18, 2017, the court entered an order terminating the litigation in accordance with defendant's counsel's letter and without any objection by any of the parties. Additionally, the court ordered that

an FD matter be opened.[5]  The court explained that defendant could move under the FD docket for a parenting time modification if he agreed to engage in services as previously recommended by the Division and ordered by the court in this action.  This appeal followed.

## II.

As in all Family Part matters, the scope of our review in Title 9 abuse or neglect matters is limited.  N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 261 (App. Div. 2018).  We will uphold the Family Part's factual findings and credibility determinations if they are supported by substantial credible evidence.  N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017).  Accordingly, we will only overturn the judge's findings if they "went so wide of the mark that the judge was clearly mistaken."  N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007).  "This deferential standard of review is appropriate because the Family Part judges are presumed to have a 'specialized knowledge and experience in matters involving parental relationships and the best interests of children.'"

---

[5]  A new case was opened the same day under FD-07-702-18 and an order entered in that action that limited defendant's contact with Melissa to supervised visitation, prohibited his contact with Maria's children, and directed Maria and Kelly to attend counseling.  Defendant did not filed an appeal from that order.

A-0470-17T1

S.K., 456 N.J. Super. at 261 (quoting N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 427 (2012)). Because of the Family Part's special expertise, we must accord particular deference to fact-finding and to the conclusions that logically flow from those findings. Cesare v. Cesare, 154 N.J. 394, 413 (1997).

However, we "owe no special deference to the trial court's rulings [w]here . . . they essentially involve[] the application of legal principles and d[o] not turn upon contested issues of witness credibility." N.B., 452 N.J. Super. at 521. We also do not give "special deference" to the Family Part's interpretation of the law. D.W. v. R.W., 212 N.J. 232, 245 (2012) (citing N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010)). Consequently, we apply a de novo standard of review to legal issues. Id. at 245-46. Although we owe no special deference to a trial court's conclusions of law, "we do not second-guess their findings and the exercise of their sound discretion." Hand v. Hand, 391 N.J. Super. 102, 111 (App. Div. 2007).

## III.

We turn first to defendant's contention that there was insufficient corroboration for the admission of Kelly's statements. We disagree.

The adjudication of abuse or neglect is governed by Title 9, which is designed to protect children. N.J.S.A. 9:6-8.21 to -8.73; N.J.S.A. 9:6-8.8. Under

16

Title 9, a child is abused or neglected if, among other causes, "[a] parent or guardian . . . commits or allows to be committed an act of sexual abuse against the child." N.J.S.A. 9:6-8.21(c)(3).

At a fact-finding hearing, the Division must prove by a preponderance of the competent, material, and relevant evidence that a child is abused or neglected. N.J.S.A. 9:6-8.46(b). This burden of proof requires the Division to demonstrate a probability of present or future harm. N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004). Title 9 cases are fact-sensitive, and the court should base its findings on the totality of the circumstances. N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011).

In a Title 9 action based upon a child's disclosure of sexual abuse, N.J.S.A. 9:6-8.46(a)(4) provides that "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect" (emphasis added). The statute "constitutes a statutorily created exception to the hearsay rule but independent evidence of corroboration is required in order to find abuse or neglect." N.B., 452 N.J. Super. at 522.

We held in N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427 (App. Div. 2002) that "indirect evidence of abuse" satisfied the statute's requirement. Specifically, we stated

> [i]n most cases of child sexual abuse . . . there is no direct physical or testimonial evidence. The child victim is often the only eyewitness to the crime, and physical corroboration is rare because the sex offenses committed against children tend to be nonviolent offenses such as petting, exhibitionism, fondling and oral copulation. Physical corroboration may also be unavailable because most children do not resist, either out of ignorance or out of respect for authority. Consequently, in order to give any real effect to the child victim hearsay statute, the corroboration requirement must reasonably be held to include indirect evidence of abuse. Such evidence has included a child victim's precocious knowledge of sexual activity, a semen stain on a child's blanket, a child's nightmares and psychological evidence.
>
> [Id. at 436 (quoting State v. Swan, 114 Wash. 2d 613 (1990)).]

The "most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence," N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018) (quoting N.J. Div. of Youth & Family Servs. v. L.A. 357 N.J. Super. 155, 166 (App. Div. 2003)), or evidence of corroborating behavior by the child. N.B., 452 N.J. Super. at 522. An "expert's opinion [may be] admissible as substantive

18

evidence to corroborate [a] child's allegation of abuse." <u>N.J. Div. of Child Prot. & Permanency v. I.B.</u>, 441 N.J. Super. 585, 598 (App. Div. 2015). That list, however, is not exhaustive. All that is required is "[s]ome direct or circumstantial evidence beyond the child's statement itself . . . ." <u>N.B.</u>, 452 N.J. Super. at 522 ; <u>see also</u> <u>Z.P.R.</u>, 351 N.J. Super. at 436 (finding that a child's inappropriate sexual behavior for his age may constitute sufficient corroboration of sexual abuse under Title 9).

"The case law does not require that the [corroborating] evidence be that specific before it can be deemed corroborative of the child's out-of-court statements." <u>Z.P.R.</u>, 351 N.J. Super. at 435. "The corroborative evidence need not relate directly to the alleged abuser." <u>Id.</u> at 436. Rather, it "<u>need only provide support for the out-of-court statements</u>." <u>L.A.</u>, 357 N.J. Super. at 166 (quoting <u>Z.P.R.</u>, 351 N.J. Super. at 436) (emphasis added). It does not need to be unassailable or conclusive. <u>N.B.</u>, 452 N.J. Super at 521 (quoting <u>L.A.</u>, 357 N.J. Super. at 166).

In determining whether sufficient corroborating evidence has been adduced, "courts must protect against conflating a statement's reliability with corroboration." <u>Id.</u> at 522. "Even if the statements made to [third parties] are considered reliable . . . consistency [in reporting abuse to others] alone does not

constitute corroboration." Id. at 523 (citing State v. J.Q., 130 N.J. 554, 582-83 (1992)).

In N.B., we reversed a finding of abuse or neglect where the trial court impermissibly relied upon uncorroborated statements. There, the child made out-of-court statements regarding his exposure to physical violence during episodes of domestic violence between his mother and her boyfriend. The trial court found that the mother's concession that she had verbal disputes with her boyfriend in the past corroborated the child's statements even though the mother denied the existence of physical domestic violence between her and her boyfriend. We concluded "[a]lthough an admission may constitute effective corroborative evidence, mother's statements herein did not sufficiently corroborate the child's statements about exposure to physical violence, because in fact, she denied the arguments constituted physical violence." N.B., 452 N.J. Super. at 522 (emphasis added). We also rejected as not corroborative the trial court's reliance upon an evaluating psychologist's findings that were based upon the victim's consistent reporting of his exposure to violence. Id. at 523.

Defendant here likens his admitting to touching Kelly on the two occasions he and Kelly identified to the mother's statements in N.B. and further argues that Maria's and Charles' statements confirming Kelly's desire to not be

alone with defendant or wanting to stay in Charles' room did not corroborate Kelly's allegation of sexual abuse. He contends that no one witnessed the abuse and there were other reasons for Kelly's behavior, such as her desire to play video games in her brother's room. We reject these contentions and conclude N.B. is distinguishable from this case in several important aspects.

Unlike N.B., where the mother denied the physical violence that was the alleged cause of her son being an abused or neglected child, here, defendant confirmed that he touched Kelly. Also, in N.B. the evaluating psychologist did not, as Rimli did here, testify at the fact-finding hearing about the child's behavior or trauma and for that reason, we held that the non-testifying expert's opinions contained in the doctor's report were inadmissible. Id. at 524-27.

Similarly, in N.B., the investigating caseworker did not testify due to illness. The Division produced the caseworker's supervisor who did not participate in the actual investigation. Id. at 519-20. "We note[d] the fact-finding hearing was conducted almost entirely on the papers. The only Division witness who provided live testimony was the supervisor who lacked personal, first-hand knowledge of the incident and conducted none of the interviews that were the basis of the Division's reports." Id. at 526-27. We "caution[ed] against such a practice," of relying on the papers only and concluded that "the trial

court's determination was not sufficiently supported by competent, admissible evidence." Id. at 527. Because both Murat and Rimli testified at the fact-finding hearing in this case, we reach a different result here.

We conclude that the record in this case contained sufficient corroborating evidence for the trial court to rely upon Kelly's out-of-court statements about her abuse by defendant. That evidence consisted of defendant's admission to touching Kelly when she said he did, albeit in a different manner, and Maria's and Charles' confirmation of Kelly's behavior. While that evidence was not direct evidence of abuse and was not unassailable, it provided the required support for the trial court to admit and rely upon Kelly's out-of-court statements in determining whether it was more likely than not that Kelly was an abused or neglected child as a result of defendant's actions. As the trier of fact, the trial court was free to accept or reject defendant's explanations for his actions and the alternate reasons presented for Kelly's behavior. The court chose to reject those explanations and we have no cause to disturb its decision.

IV.

Turning to defendant's remaining arguments, we find them to be without merit. First, his challenge to Rimli's qualifications is belied by the record of her education, training, and experience. Also, the trial court properly held that there

is no requirement that in order to be qualified, an expert had to take specific courses or publish books or articles. See N.J.R.E. 702; N.J.R.E. 703 (addressing the requirements for the admission of expert testimony); see also Townsend v. Pierre, 221 N.J. 36, 53 (2015); State v. Torres, 183 N.J. 554, 572 (2005). We discern no abuse in the trial court's discretion in qualifying Rimli as an expert. See Townsend, 221 N.J. at 52; Torres, 183 N.J. at 572 ("The trial court has discretion in determining the sufficiency of the expert's qualifications and [its decision] will be reviewed only for manifest error and injustice.") (citations omitted).

Second, defendant's claim that his due process rights were violated by the Division's failure to disclose in discovery that Murat conducted a second interview of Charles is equally without any support. Contrary to defendant's argument, we conclude that defendant's due process rights were protected by his receipt of sufficient "notice defining the issues [to be tried] and an adequate opportunity to prepare and respond." N.J. Div. of Youth & Family Servs. v. B.M., 413 N.J. Super. 118, 126 (App. Div. 2010) (citations omitted).

The only issue raised through Murat's discussions with Charles was his sister's wanting to sleep in his room, a subject matter that was fully disclosed throughout all of the Division's records and pleadings that defendant had prior

to trial. Moreover, defendant's counsel did not object to the testimony about the second interview and in fact used it to challenge Murat on cross-examination and to undermine the Division's conclusions. Counsel conceded during summations that she was able to address the undisclosed second interview that contained Charles' disclosure about Kelly wanting to play his video games as the reason for staying in his room. Counsel stated:

> [I]t's not fair for the defense counsel not to have access to such important critical information with respect to corroboration. We didn't get that access to that information that we rightly deserve to have[.]
>
> . . . .
>
> Having said that, Your Honor, I did have the opportunity to cross examine [Murat] and she candidly said that [the brother] did not — [the brother] said [Kelly] wanted to be in the room to play video games. He never said she wanted to be in the room because [defendant] was touching her inappropriately.

Finally, we find defendant's remaining arguments about there being a lack of sufficient evidence to sustain the trial court's conclusions and the trial court's directing the entry of an FD order with his consent to continue his supervised visitation of Melissa to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION