# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2564-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

K.G. and W.D.U.,

      Defendants,

and

F.S.L.,

      Defendant-Appellant.

_____

IN THE MATTER OF
V.D.G. and D.D.S., minors.

_____

      Submitted April 22, 2026 – Decided May 7, 2026

      Before Judges Berdote Byrne and Jablonski.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FN-20-0029-24.

Ivette Santos, attorney for appellant.

Jennifer Davenport, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor V.D.G. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

After a fact-finding hearing, a Family Part judge found the Division of Child Protection and Permanency ("the Division") proved by a preponderance of the evidence that defendant, F.S.L. ("Frank"), sexually abused his nine-year-old stepdaughter, V.D.G. ("Vera").[1] Defendant appeals and contends Vera's hearsay allegations were inadequately corroborated at trial. Vera's Law Guardian joins with the Division in advocating that we uphold the trial court's decision. Applying the governing legal principles under Title Nine and the strong deference we owe to the Family Part's factual and credibility findings,

---

[1] We use initials and pseudonyms to protect the children's identities. R. 1:38-3(d)(12).

A-2564-24

we affirm substantially for the reasons set forth in the cogent written opinion of Judge Gavin I. Handwerker.

I.

Since the parties are familiar with the evidence and the case's procedural history, we need not describe the background in much detail, other than these facts for context.

On August 31, 2023, the Elizabeth Police Department referred a matter to the Division following a report from "Wesley," Vera's biological father, regarding suspected inappropriate sexual conduct by Frank, Vera's stepfather, who was alleged to have improperly touched Vera's genital area that Vera characterized as her "kitty." Vera resided with her mother, K.G. "Kelly," Frank, her maternal uncle, and her half-brother. Following the allegations, Kelly ejected Frank from the home and relocated Vera to her maternal grandmother's residence. Wesley then contacted police.

On September 1, 2023, Detective Jorge Rios interviewed Vera, who disclosed two incidents of sexual abuse by Frank while her mother was absent and Vera was presumed to be asleep. Vera described the first incident as Frank placing his hand on her private area under her clothing and penetrating her, and the second as an attempted repetition, which she resisted by covering

3

herself, after which Frank pulled down her pants. Vera identified Frank as the perpetrator based on his distinctive breathing and the fact that he was the only other person awake. Vera was reluctant to discuss the incidents because of their disturbing nature. She was clear, however, that she was awake during both incidents and certainly understood what had occurred.

Det. Rios also interviewed several individuals regarding Vera's allegations. Wesley reported learning of the allegations from Kelly, who stated that Vera disclosed Frank had attempted to pull down her pants and touch her. Kelly corroborated Vera's account, noting Vera said someone tried to pull her pants down while she was sleeping. Kelly confronted Frank, who denied the allegations. Kelly also noted Vera appeared to behave normally at the time of the disclosure. "Denny," Vera's uncle, learned of the allegations from his mother, "June," and confirmed he left Kelly's residence following Vera's disclosure.

Det. Rios interviewed Frank, who stated that Vera entered a room where he and Kelly were present and reported that someone had attempted to pull her pants down. Frank denied that Kelly questioned him about the incident. He explained that he typically only entered Vera's room to clean it and described his relationship with Vera as a normal stepparent/stepchild relationship. Frank

4

A-2564-24

discussed Wesley's desire for custody of Vera and relief from child support. He asserted that Vera was not generally dishonest, but believed she would lie to support Wesley, whom he accused of coaching her. Frank denied Vera's allegations, questioning why he would commit such an act given his responsibilities and family.

Division caseworker Jessica Patino interviewed the relevant parties as well. Wesley explained to her that Kelly informed him of Vera's disclosure on August 25, after which Vera remained with him. Wesley contacted police on August 31 despite Kelly's warning that this could jeopardize their marriage. Wesley was unaware of any prior allegations involving Vera.

Patino reported Vera described her family's situation as "disturbing" and "way too inappropriate," but declined to elaborate, indicating she had already spoken to law enforcement.

Vera's grandmother "June" and her husband "Fred" stated that Kelly brought Vera to their home for her own safety. During that time, Vera disclosed to them that Frank had attempted to pull her pants down the previous evening. Both June and Fred described Vera as intelligent and truthful, and Fred noted that Frank had previously faced similar accusations.

A-2564-24

Kelly confirmed Vera's disclosure regarding Frank's conduct and stated that Vera had never made these allegations previously. Kelly was surprised and expressed shock and uncertainty about the situation. Kelly also noted she was unaware of any prior concerns regarding Frank and Vera's interactions.

Finally, Patino spoke with Frank but did not address Vera's allegations directly. Rather, Frank indicated Kelly told him of Vera's accusations. He corroborated that he left the family home. Further, he shared his understanding (from communication with Kelly) that Wesley wanted custody of Vera.

Dr. Carolyn Gonzalez-Cruz, Ph.D. performed a forensic psychological examination of Vera. During the evaluation, Vera disclosed two incidents of inappropriate sexual contact by Frank, identifying him as the perpetrator. Vera described the first incident as Frank touching her genital area under her clothing, and the second as Frank pulling down her shorts and touching her buttocks. Psychological testing revealed clinically significant symptoms of depression and anxiety, including negative mood, sleep and appetite disturbances, and distrust of others due to fear of sexual motives. Dr. Gonzalez-Cruz diagnosed Vera with Adjustment Disorder with Depression and recommended psychotherapy with a specialist in intrafamilial sexual abuse, no

6

contact between Vera and Frank, continued monitoring by the Division, school accommodations, and participation in extracurricular and mentoring programs. Vera told Dr. Gonzalez-Cruz that she believed Frank's conduct was inappropriate and expressed feelings of disgust toward him, while also experiencing complex emotions regarding her current family situation.

The Division substantiated the allegations against Frank and filed a verified complaint for care and supervision of Vera. On October 31, the court granted this relief. A fact-finding hearing took place over two non-consecutive days. The Division called three witnesses: Dr. Gonzalez-Cruz, Det. Rios, and Patino. Frank testified in his own defense.

Dr. Gonzalez-Cruz was qualified as an expert in child psychology and testified about the substance of the psychological evaluation she performed and the recommendations she made. Frank objected to the Divison's questioning Dr. Gonzalez-Cruz as to what Wesley, who brought Vera to the evaluation, told her, asserting that it was inadmissible hearsay. The court overruled his objection and permitted the testimony.

According to Dr. Gonzalez-Cruz, Wesley told her that he was informed by Kelly, over the telephone, that someone had attempted to pull down Vera's pants and that Vera was subsequently dropped off at her maternal

grandmother's house. Wesley further stated that Vera disclosed to him that Frank had touched her inappropriately and sexually molested her. However, Wesley indicated that Vera did not tell him all the details of the events, particularly after being interviewed by detectives. Vera initially disclosed the incident to her mother and later to her maternal grandmother.

Wesley reported behavioral changes in Vera following her disclosure of sexual abuse by Frank, including difficulty adjusting to a new school, missing her younger brother and mother, having trouble sleeping, and confronting problems following directions. Wesley denied having any prior issues with Vera regarding dishonesty or fabricating stories.

Dr. Gonzalez-Cruz continued to testify as to the two incidents Vera discussed during their interview, which occurred on consecutive nights. Vera stated that during the first incident, she was at home, asleep in her room, when Frank entered and touched her vaginal area under her clothing. She provided sensory details about the incident and noted that Frank did not speak to her but made certain sounds before leaving the room. Additionally, Vera noted her mother was not home, her uncle was at his girlfriend's house, her younger brother was asleep, and Frank was the only other person present.

8

Vera reported that the second incident occurred the following night and was different from the first Vera expressed feelings of worry and described that she had difficulty sleeping and adjusting to changes in her living situation, including moving to her grandmother's and then to her father's home. Vera indicated this affected her school and routine. Based on Vera's verbalization of depressive symptoms, corroborated by Wesley's observations and elevated scores on the Children's Depression Inventory, Dr. Gonzalez-Cruz diagnosed Vera with adjustment disorder with depression. Judge Handwerker held the Division proved that Vera was an abused or neglected child by a preponderance of the evidence under N.J.S.A. 9:6-8.9(c) and entered an order memorializing that decision.

Defendant appeals and raises two raises two principal issues: (1) the trial court erred in finding he abused Vera and in the matter it corroborated her allegations, and (2) the trial court deprived defendant of his right to confrontation.

II.

Our scope of review is limited. We "defer to the factual findings of the Family Part if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452

9

N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). We defer to the Family Part's "special jurisdiction and expertise in family matters." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 392, 413 (1998) ). We also cede to the Family Part judge's credibility and factual determinations and will overturn them only if their "findings 'went so wide of the mark that a mistake must have been made.'" N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting S.B. Snyder Realty v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). However, we review a trial judge's interpretation of the law de novo. N.J. Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 374 (2024) (citing N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017)).

Title Nine, N.J.S.A. 9:6-8.8 to -8.73, governs child abuse and neglect actions. N.J.S.A. 9:6-8.21(c)(3) defines an "[a]bused or neglected child" as a "child less than [eighteen] years of age whose parent or guardian . . . commits or allows to be committed an act of sexual abuse against the child." A finding of sexual abuse must be based on a "preponderance of the evidence." N.J.S.A. 9:6-8.46(b). Under N.J.A.C. 3A:10-7.4(a)(2), a finding of substantiated sexual

abuse includes "[s]ubjecting a child to sexual activity or exposure to inappropriate sexual activity or materials."

Frank contends the statements proffered as corroborative of Vera's allegations are evidentially infirm as hearsay. We review a judge's determination concerning corroborating evidence under N.J.S.A. 9:6-8.46(a)(4) de novo. N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 156 (App. Div. 2018) (reasoning such a finding "essentially involve[s] the application of legal principles and d[oes] not turn upon contested issues of witness credibility") (quoting N.B., 452 N.J. Super. at 521). Under N.J.S.A. 9:6-8.46(a)(4), "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect," See also N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011) ("[A] child's hearsay statement may be admitted into evidence [] but may not be the sole basis for a finding of abuse or neglect.").

"The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div.

11

2003). Corroborating evidence need not independently prove the abuse or neglect occurred. A.D., 455 N.J. Super. at 161. New Jersey courts have found:

> In most cases of child sexual abuse . . . there is no direct physical or testimonial evidence. The child victim is often the only eyewitness to the crime, and the physical corroboration is rare because the sex offenses committed against children tend to be nonviolent offenses such as petting, exhibitionism, fondling and oral copulation. Physical corroboration may also be unavailable because most children do not resist, either out of ignorance or out of respect for authority. Consequently, in order to give any real effect to the child victim hearsay statute, the corroboration requirement must reasonably be held to include indirect evidence of abuse.
>
> [N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002) (quoting State v. Swan, 114 Wn.2d 613, 615-16 (Wash. 1990)).]

The corroboration requirement may be satisfied by indirect evidence, such as "a child victim's precocious knowledge of sexual activity, a semen stain on a child's blanket, a child's nightmares and psychological evidence." N.J. Div. Of Child Pro. & Permanency v. I.B., 441 N.J. Super. 585, 591 (App. Div. 2015) (quoting Z.P.R., 351 N.J. Super. at 436). In Z.P.R., we found "no doubt that evidence of age-inappropriate sexual behavior could provide the necessary corroboration required by N.J.S.A. 9:6-8.46(a)(4)." 351 N.J. Super.

at 436.    Similarly, a child's "knowledge of sexual practices beyond her reasonably anticipated imagination" may corroborate the child's reported sexual abuse.  Ibid. (quoting State v. D.R., 214 N.J. Super. 278, 298 (App. Div. 1986)).

Having reviewed the record under our standards of  review, we are satisfied Judge Handwerker correctly found corroborating evidence to support Vera's hearsay statements regarding Frank's sexual abuse of her.   Judge Handwerker found Dr. Gonzalez-Cruz credible because she provided clear, thorough, and detailed testimony without evasion or exaggeration, and was not effectively impeached.   The court also found Det. Rios credible, and Pitino believable, although he also noted Pitino's strong investment in Vera's claims led to some periodic evasiveness on cross-examination.

Substantively, Judge Handwerker found Vera's hearsay statements to be sufficiently corroborated by Vera's advanced sexual knowledge for her age and further by Dr. Gonzalez-Cruz's psychological opinion.   Vera's statements to Dr. Gonzalez-Cruz were consistent with Vera's other out-of-court statements and included detailed descriptions of abuse and atypical sexual knowledge for a nine-year-old.   The court also credited Vera's expressed feelings of disgust toward Frank's behavior and her awareness of the familial conflict her

13

disclosure would cause. In sum, the judge did not rely solely on Vera's hearsay statements as the bases for his finding abuse or neglect. See <u>P.W.R.</u>, 205 N.J. at 33.

III.

Finally, Frank argues he has a guaranteed right to cross-examine Vera under the circumstances of this Title Nine hearing. We do not find this argument has sufficient merit to warrant discussion in a written opinion other than to mention that we squarely decided this issue in our decision in <u>N.J. Div. of Child Prot. & Permanency v. N.T.</u>, 445 N.J. Super. 478, 492 (App. Div. 2016) in which we reaffirmed the Sixth Amendment right to confrontation applies to criminal but not civil proceedings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2564-24