# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5173-17T1
                A-5866-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

T.J. and J.F., Jr.,

      Defendants-Appellants,

and

 B.G.,

      Defendant.

_____

IN THE MATTER OF JM.F.
and J.G.,

      Minors.

_____

Submitted November 4, 2019 – Decided July 30, 2020

Before Judges Messano and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0331-15.

Joseph E. Krakora, Public Defender, attorney for appellant T.J. (Robyn A. Veasey, Deputy Public Defender, of counsel; Thomas Gerard Hand, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant J.F., Jr. (Robyn A. Veasey, Deputy Public Defender, of counsel; John Andrew Albright, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Nedda Alvarez, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor JM.F. (Olivia Belfatto Crisp, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In a December 22, 2015 fact-finding order, the Family Part determined defendants T.J. (Tara)[1] and J.F., Jr. (Joe) (collectively referred to as "defendants") abused or neglected their seven-year-old daughter Jm.F. (Jane) by failing to support Jane following her disclosure she was sexually abused by

---

[1] We employ initials and pseudonyms to protect records and information from disclosure that are excluded from public access under Rule 1:38-3(d)(12).

Kevin, the son of Joe's paramour; denying Jane's claims of sexual abuse and threatening Jane if she continued to disclose the abuse; and depriving Jane of counseling services required to address her exposure to Kevin's abuse, domestic violence between Tara and her paramour, B.G. (Ben), and Tara's substance abuse.[2] Tara and Joe separately appealed from the court's order, and we consolidated the appeals. Having considered the record in light of the applicable legal principles, we are convinced there is substantial credible evidence supporting the court's findings and determinations, and we affirm.

I.

The evidence presented during the fact-finding hearing shows that in February 2015, seven-year-old Jane lived with Tara and Tara's and Ben's eight-month-old daughter, J-L.G. (Judy). On weekends, Jane visited Joe at the home he shared with his paramour and Kevin, who was thirteen.

Due to Jane's behavioral issues in school, Tara arranged for Jane to have in-home therapy sessions. During a February 25, 2015 session, Jane disclosed to licensed therapist Marcella Prosper that she did not like going to Joe's house because Kevin touched her, kissed her, and stuck his tongue in her mouth. Jane

---

[2] The Division's complaint asserted Ben abused or neglected Jane, but the court dismissed the claim against Ben at the conclusion of the Division's case at the fact-finding hearing.

A-5173-17T1

also reported Kevin touched her "down there," "put his hand in [her] panties," and laid on top of her. Jane described her apprehension about reporting Kevin, explaining she believed she would get in trouble.

At Prosper's request, Jane repeated the accusations to Tara. According to Prosper, Tara "seemed to get angry and she started yelling at [Jane]," said she did not believe Jane and accused Jane of "lying," and said Jane "always [told] stories." Prosper informed Tara that she had an obligation to report the alleged sexual abuse to the New Jersey Division of Child Protection and Permanency (Division). Tara did not report the alleged abuse to the Division, but Prosper did.

The following day, Division caseworker Hikeema Raeford spoke with Joe about Jane's allegations concerning Kevin. Joe said that although "he would not say his daughter is a liar, . . . she does lie about a lot of different things." Joe expressed "doubts" about the allegations; said he "believe[d] that something may have happened" but that Jane was "exaggerating"; and informed Raeford he was "almost 100% sure the allegations are false." Joe further explained he told Jane "it is okay to tell the truth," and informed her about the "consequences of lying." Joe told Raeford he spoke to Jane about the allegations; she said she did not want to tell him what happened because she thought she "was going to get beat";

4

and he did not understand Jane's concern because he had never beaten her and had, instead, only spanked her two or three times in her life.

Joe also said he did not want the Division involved; he was not interested in cooperating with the Division; he was conducting his own investigation into Jane's allegations; and he was declining any services from the Division for him and Jane. He reported to Raeford that Kevin denied the allegations, and Kevin and Jane were never alone, and did not sleep together, at his home. Joe requested Raeford keep him informed of each step of the investigation and said he wanted to be present at any future interviews with Jane.

Raeford told Tara the Hudson County Prosecutor's Office (HCPO) agreed to investigate the allegations and wanted to interview Jane. Tara initially said she would bring Jane to the HCPO after school and later asked Raeford if she could be in the room with Jane during the interview. When Raeford told Tara she could not be in the room during the interview, Tara said she would not permit Jane to be interviewed by the HCPO and would not permit Raeford in her home to interview Jane. Tara reported that Joe advised her not to allow Raeford into her home to speak with Jane. The HCPO never interviewed Jane.

Raeford received a telephone call from Joe, who reminded Raeford that he told her to keep him informed of each step of the investigation. He told

Raeford he "shutdown" everything and informed Tara and Kevin's mother not to cooperate with the Division or the HCPO. Raeford informed Joe the Division was not investigating an abuse or neglect claim, but instead was interested in providing services. Joe told Raeford he would conduct the investigation and he would not allow the Division in Jane's home or to provide Jane any services.

Raeford and another caseworker went to Tara's home to interview Jane, but no one answered the door. Raeford called Joe and asked if Jane was with him. Joe denied Jane was with him and reminded Raeford he previously told her he did not want her speaking to the child. He told Raeford he instructed Tara to leave the home and flee with Jane and Judy. Raeford informed Joe she would contact the police to obtain access to Jane.

The local police arrived at Tara's home, and, at the same time, Joe appeared. Joe told the police Tara and Jane were in the home and he would have Tara open the door. As it turned out, Jane opened the door, and the police entered the home and spoke with Tara. Joe told the officers he was opposed to Jane being interviewed by the HCPO without a parent in the room and the Division was making more out of the allegations than was warranted. The officers advised Joe that Raeford needed to speak with Jane and that he could be present, but Joe declined.

6

Raeford interviewed Jane, who reported she was in second grade. Jane said she wanted to tell Raeford about Kevin, but she would be beaten if she did so. Jane then disclosed that on two occasions Kevin touched her vaginal area, which she referred to as her "cooch," on top of and underneath her underwear, and that he also tried to kiss her. Jane denied that Kevin tried putting his tongue in her mouth, but said he touched the upper part of her buttocks.

Jane also revealed that Tara and Ben smoked marijuana. She described marijuana as "brown," said it "smelled funny," and referred to it as "weed." Jane also reported that Tara did not smoke weed, and that she knows what "weed" is because Ben smoked it in the bathroom.

Jane told Raeford both that Tara does not drink alcohol and that Tara drinks "one beer a day." According to Raeford, Jane also said Tara "drinks alcohol" and demonstrated Tara's demeanor "once [while Tara] was drinking while holding" Judy. Jane demonstrated to Raeford that Tara held Judy in her arms, with Tara's "legs collapsing and her head falling down as if she was sleeping." Jane reported she could not wake up Tara, and she took Judy from Tara's arms and put the infant in bed.

Jane also reported that Tara and Ben sometimes fought. She said that Ben choked Tara around the neck, and that she intervened to prevent him from

harming her mother. Jane also told Raeford Tara and Ben fought "each other with pots" and Ben once threw bottles at Tara.

After Raeford's February 26, 2015 interview with Jane, Tara advised Raeford she would not cooperate with the Division or the HCPO regarding Jane's allegations concerning Kevin. Raeford advised Joe there were concerns about domestic violence and substance abuse in Tara's home, and Joe said "whatever is going on he would take care of the situation." Tara and Joe stated they would not voluntarily submit for drug or psychological tests unless ordered to do so by the court, but they each agreed to a safety protection plan prohibiting any contact between Kevin and Jane.

Following the therapy session at which Jane made the sexual abuse disclosures, Prosper observed that it became increasingly difficult to schedule subsequent in-home therapy sessions with Jane. Prosper had three more therapy sessions with Jane after the initial disclosures, but, although additional therapy sessions were approved, they were never conducted because Tara did not respond to Prosper's efforts to schedule them. Joe informed Raeford that he instructed Tara not to allow Prosper in Tara's home to provide Jane services to address her behavioral issues.

A-5173-17T1

After the disclosures were first made, Tara was initially receptive to the Division's involvement and told Raeford she could speak to Jane at Tara's home, but she then said Joe advised her not to allow Raeford into the home or to speak with Jane. According to Raeford, after her initial interview with Jane, and until Jane and Judy were later removed by the Division on April 22, 2015, Tara was unwilling to do anything the Division requested. Raeford explained that after the children were removed, Tara "started to comply" with the Division's requests.

On March 17, 2015, the Division filed a verified complaint against Tara, Joe, and Ben for the care and supervision of Jane and eight-month-old Judy. During a hearing held the same day, the Division relayed to the court Jane's reports concerning Kevin's sexual abuse and Tara and Ben's fighting and use of marijuana. The Division also reported Joe's statements that he did not want the Division to investigate the sexual abuse allegations and Tara's refusal to participate in a formal interview with the Division. The Division sought care and supervision of Jane and Judy and an evaluation of Jane at the Audrey Hepburn Children's House (AHCH), a diagnostic and treatment center for children. The court ordered the requested relief, granting the Division care and supervision of the children and directing that Jane be evaluated at AHCH.

The Division arranged for an April 21, 2015 psychosexual evaluation of Jane with Dr. Kirsten Byrnes at AHCH. Immediately following the evaluation, Dr. Byrnes reported to Raeford that Jane initially denied any sexual contact by Kevin, but then said he "attempted to touch her butt and kiss her." Jane also told Dr. Byrnes she did not want to further discuss Kevin's actions because she feared Tara would find out and she would be "whooped." Dr. Byrnes advised Raeford that Jane said Tara beat her with a belt and wire and punched her in the stomach, and that Joe beats her with his hands and a belt. Dr. Byrnes further reported Jane said Tara told her not to disclose anything regarding sexual abuse or substance abuse, and Tara and Ben told Jane "the family would not be able to move to North Carolina[3] and she would be beat" if she made such disclosures.

After speaking with Dr. Byrnes, Raeford told Tara she needed to speak further with Jane. Tara refused and said she wanted to speak with Dr. Byrnes. Tara spoke with Dr. Byrnes and left AHCH with Jane without speaking to Raeford. Raeford later called Joe, who said Jane was with him, but Joe refused

---

[3] The maternal grandmother had plans to move to North Carolina, and Tara planned to move there with the children.

to provide Raeford his location. Raeford was unable to reach Tara on the telephone and went to Tara's home, but Tara and Jane were not there.

Based on information supplied by Dr. Byrnes, the Division immediately attempted a Dodd[4] removal of the children. Raeford, however, was unable to contact or find Tara and the children until April 22, 2015 when, with the assistance of the Human Services Police Department, Raeford removed the children from Tara's custody.

Jennifer Wisely, a Division intake worker, interviewed Jane during the removal. Jane said Tara was angry with her following the AHCH evaluation and told Jane she was going to be taken away. Jane reported Tara told her not to talk about Ben and if she did, Jane "would get beaten and . . . not be able to go to North Carolina with the family." Nonetheless, Jane told Wisely she was tired of lying, Tara and Ben "fight both physically and verbally," and Ben "smokes marijuana in the bathroom" of her home. Jane further stated that Tara did not believe her allegations about Kevin "and was yelling at her and calling

---

[4] A "Dodd removal" is an emergency removal of a child from the custody of a parent without a court order, as authorized by N.J.S.A. 9:6-8.29, which is a provision within the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

her bad names." She also reported there had not been any recent incidents between Tara and Ben.

The Division filed an amended verified complaint against Tara, Joe, and Ben for care, supervision, and custody of Jane and Judy. At the April 24, 2015 removal hearing, the court granted the Division care, custody, and supervision of the children and ordered weekly supervised visitation by Tara and Joe until placement of the children with a family, with liberal supervised visits thereafter.

The court later conducted a fact-finding hearing on the allegations of abuse or neglect against Tara, Joe, and Ben during which the Division presented Prosper, Raeford, Wisely, and Dr. Anthony Vincent D'Urso as witnesses.

Dr. D'Urso was qualified as an expert in the field of psychology and is the section chief and supervising psychologist at the AHCH. Based on his review of Dr. Byrnes's clinical assessment of Jane and the standards in the Diagnostic and Statistical Manual of Mental Disorders III (DSM),[5] Dr. D'Urso diagnosed Jane with "disorders of extreme stress not otherwise specified." According to Dr. D'Urso, "this particular diagnosis, in essence, . . . is [p]ost [t]raumatic [s]tress [d]isorder with not one [triggering] event, but multiple [triggering]

---

[5] The DSM is "an authoritative text published by the American Psychiatric Association that classifies mental disorders." Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 59 (2019).

events that lead to the same problems of emotion." Dr. D'Urso based the diagnosis on Jane's "dysregulated behaviors that [were] . . . reported in multiple sources, school reports, by [Tara], by [Joe]," including "problems in school," "social isolation," reports of being "bullied," "anger and acting out," and "a lot of avoidant behavior." Dr. D'Urso also explained Jane described somatic responses to stress, stomach difficulties, and problems with sleep that are typical of children with the disorder.

Dr. D'Urso noted that during her psychosocial evaluation, Jane "recanted that [Kevin] had touched her." However, in part based on Jane's "sexualized knowledge," Dr. D'Urso concluded the underlying claim of inappropriate sexual contact was clinically supported and that Jane's recantation was a "function of family support, [such] that if a child's getting support for a disclosure, they're less likely to recant."

Dr. D'Urso noted other triggers for Jane's stress disorder that were clinically supported. He found Jane's statements about her parents' use of corporal punishment clinically supported a concern about physical abuse that needed to be addressed. He also found Jane's reports of marijuana and alcohol use by Tara clinically supported a need to address possible substance abuse as a cause of Jane's stress disorder. He explained that he did not conclude as a matter

13

of fact that Jane's parents actually used corporal punishment or that Tara used marijuana or alcohol. Instead, he testified that Jane's statements clinically supported a determination those issues should be addressed in Jane's treatment.

Dr. D'Urso found Tara's and Joe's responses to Jane's reports to the Division clinically supported emotional abuse of Jane. He explained that prior to Jane's disclosures concerning Kevin's sexual abuse, Tara and Joe were aware Jane had "emotional and behavioral problems" because Jane was already receiving in-home therapy sessions, and it was "important to get at the source of those behavioral difficulties and emotional reactions." He testified that where there is a delay in seeking treatment, a child's "emotional deterioration" continues "accruing and affecting [ ] behaviors" "until such time as [her] parents say it's okay to get therapy."

He further testified Tara's and Joe's actions following Jane's initial disclosure "block[ed] . . . an attempt to explore" Kevin's sexual abuse of Jane and "the services that could have been put in place and could have then explored [Jane's] various reactions and statements were halted and not in place." Dr. D'Urso also explained Tara's and Joe's efforts to prevent Jane from reporting the sexual abuse caused her emotional harm. He testified that "no child is served well emotionally by saying something that is untrue, and conversely, no child is

served by having to deny something that happened to them." Dr. D'Urso cited Jane's statement that she "started this whole thing," as supporting his conclusion that her parents' efforts to stop her from discussing the sexual abuse and other family related triggers for her stress placed an "emotional responsibility" on her "that should [not] be put on a child . . . [and] leads to re-victimization."

Joe and Ben moved for judgment after the Division presented its evidence. The court granted Ben's motion, finding Jane's statements concerning the alleged domestic violence between Ben and Tara and Ben's alleged use of marijuana, even if accepted as true, were too general and inadequate to support a finding he abused or neglected Jane or Judy. The court denied Joe's motion, finding the evidence was adequate to establish a prima facie case he abused or neglected Jane.

Tara called three witnesses, E.J., T.B., and C.S., each of whom had occasion to observe Tara parent Jane. They each testified they had seen Tara properly care for Jane.

Joe testified on his own behalf and admitted he told Raeford he would conduct his own investigation into his daughter's allegations concerning Kevin. Joe denied coaching Jane prior to any interviews, telling Jane to lie to investigators, or instructing Tara to flee with the children. On cross-

examination, Joe acknowledged Jane displayed emotional and behavioral problems, but he said he did not believe she required services. Joe admitted telling Tara not to cooperate with the Division's investigation.

On December 22, 2015, the court rendered a decision from the bench. The court summarized the testimony of Raeford concerning her interactions and conversations with Tara and Joe and her interview of Jane. Although it did not mention Wisely by name, the court also cited and relied on her testimony concerning her interview with Jane following the removal.

The court found credible Dr. D'Urso's testimony regarding Jane's emotional issues and her parents' actions following her report that Kevin sexually abused her. The court noted Dr. D'Urso diagnosed Jane with "extreme stress, complex trauma, PTSD stemming from . . . multiple events," and that Jane exhibited "stomach difficulties, problems with sleep, and psychological symptoms" Dr. D'Urso described as "psychic numbing."

The court accepted Dr. D'Urso's testimony that Jane's report of sexual abuse by Kevin was supported by sexualized knowledge that would not be typically expected from a child of her age. The court further relied on Dr. D'Urso's testimony that Jane's recantation of her claims regarding Kevin and provision of details regarding the sexual abuse clinically supported Jane's

statements her parents were upset about her making the report and pressured her not to disclose Kevin's actions. The court relied on Dr. D'Urso's opinion Jane suffered an aggravation of her emotional issues by her parents' lack of support, and their failure to continue her counseling, and they re-victimized her by pressuring her not to disclose the abuse.

The court found Tara's witnesses credible but their knowledge limited; the court found they had no knowledge concerning Jane's issues and her parents' actions and their testimony added little to the alleged abuse or neglect at issue. The court found Joe was forthright about his view the Division should not be involved in his family's affairs, but the court determined Joe "was not qualified to evaluate the situation."

The court found Jane was threatened by her parents not to make disclosures to the Division and that her parents "were not supportive in having appropriate evaluations and appropriate counseling." The court determined the parents' lack of support of Jane following her disclosure of Kevin's sexual abuse, and their threats if she continued to make the disclosures, "re-victimized [her] and caused more emotional harm by depriving her of the counseling she badly needed."

The court concluded Tara and Joe abused or neglected Jane by failing to provide her with the minimum degree of care and thereby causing her emotional harm. The court based its determination on "the lack of support, the threats, the deprivation of counseling that was so sorely needed because of a lot of things: the domestic violence, the substance abuse, and the sexual abuse[.]"

The court entered an order finding Tara and Joe abused or neglected Jane by failing to support Jane following her disclosure she was sexually abused by Kevin; by denying Jane's claims of sexual abuse and threatening Jane if she continued to disclose the abuse; and by depriving Jane of counseling services required to address her exposure to Kevin's abuse, domestic violence between Tara and Ben, and Tara's substance abuse.

II.

Prior to addressing Tara's and Joe's arguments, we summarize the principles applicable to a consideration of an order finding abuse or neglect. Our review of the "fact-findings of the Family Part judge" is strictly limited. N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010) (citing Cesare v. Cesare, 154 N.J. 394, 411 (1998)). "[F]indings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." N.J. Div. of Youth & Family Servs. v.

18

Z.P.R., 351 N.J. Super. 427, 433 (App. Div. 2002) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "[A]n appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (second alteration in original) (quoting Rova Farms, 65 N.J. at 484). However, we need not defer to the trial court on questions of law. N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 330 (App. Div. 2011).

To establish a child has been abused or neglected under Title Nine, the Division must show by a preponderance of the "competent, material and relevant evidence" that a child is an "abused or neglected" child as defined in N.J.S.A. 9:6-8.21. N.J.S.A. 9:6-8.46(b). An "abused or neglected child" is

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his [or her] parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]
>
> [N.J.S.A. 9:6-8.21(c)(4).]

19

"Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82 (1999). Failure to exercise a "minimum degree of care" requires "conduct that is grossly or wantonly negligent, but not necessarily intentional." Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 299-300 (2011) (quoting G.S., 157 N.J. at 178). "[T]he concept of willful and wanton misconduct implies that a person has acted with reckless disregard for the safety of others." G.S., 157 N.J. at 179 (citing Fielder v. Stonack, 141 N.J. 101, 123 (1995)).

To determine if a parent failed to exercise the requisite "minimum degree of care," "the inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger." Id. at 182. "[A] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. In deciding whether a child has been abused or neglected, courts "must base [their] findings on the totality of the circumstances . . . ." V.T., 423 N.J. Super. at 329.

The court should focus on the "parent's conduct at the time of the incident to determine if a parent created an imminent risk of harm to a child." Dep't of Children & Families, Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 189 (2015). A child need not be "actually irreparably impaired by parental inattention or neglect" for a court to find that a parent failed to exercise a minimum degree of care. See In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 616 n.14 (1986)).

In their separate briefs on appeal, Tara and Joe make similar arguments. They assert the court's findings of fact are not supported by credible evidence because they are based on Jane's uncorroborated statements to Prosper, Raeford, Wisely, and Dr. Byrnes, and the Dr. D'Urso's testimony, which they claim is not competent evidence. They also contend there is insufficient credible evidence supporting the court's finding they abused or neglected Jane. Joe makes an additional argument; he claims the court erred by denying his motion for an involuntary dismissal following the close of the Division's case.

An essential premise of the court's abuse or neglect finding is that Jane was the victim of sexual abuse by Kevin; Jane witnessed domestic violence between Tara and Ben; and Jane witnessed Tara's abuse of alcohol. Indeed, it

was Tara's and Joe's alleged efforts to prevent Jane's disclosure of those incidents and actions, and their purported failure to obtain counseling related to her exposure to them, upon which the court made its abuse and neglect finding.

Tara and Joe argue the finding of abuse or neglect must be reversed because it is based in part on Jane's allegations of sexual abuse by Kevin, Tara's substance abuse, domestic violence between Tara and Ben, and Tara's and Joe's threats of punishment and repercussions if Jane made disclosures about the sexual abuse and her parents. They contend the court's reliance on Jane's statements to the Division caseworkers and Dr. Byrnes was not corroborated by competent evidence and therefore could not provide a basis for the court's abuse or neglect finding.

In Title Nine proceedings, a child's hearsay statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4); see also N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 272 (App. Div. 2018). The statute "constitutes a statutorily created exception to the hearsay rule but independent evidence of corroboration is required in order to find abuse or neglect." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513,

522 (App. Div. 2017). We review de novo a court's determination a child's hearsay statements have been sufficiently corroborated under N.J.S.A. 9:6-8.46(a)(4). N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018).

"The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." Ibid. (quoting N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003)). However, "[a] child's statement need only be corroborated by '[s]ome direct or circumstantial evidence beyond the child's statement itself.'" Ibid. (alteration in original) (quoting N.B., 452 N.J. Super. at 522). Corroborative evidence must "'only provide support' for the child's statements," ibid. (quoting N.B., 452 N.J. Super. at 521), and need not be "'offender-specific,' because '[i]t would be a rare case where evidence could be produced that would directly corroborate the specific allegation of abuse between the child and the perpetrator,'" ibid. (alteration in original) (quoting Z.P.R., 351 N.J. Super. at 435). Corroborative evidence may be circumstantial, but it "must be independently admissible for a court to deem it corroborative of a child's statement." Ibid.

We find no competent evidence supporting the court's finding of domestic violence between Tara and Ben. Jane reported physical altercations between Tara and Ben—including the throwing of pots and pans and Ben's alleged choking of Tara—but Tara's out-of-court statements concerning the alleged domestic violence are not otherwise corroborated. Lacking such corroboration, the court could not properly rely on Jane's reports of domestic violence, see N.B., 452 N.J. Super. at 522, to support its finding Tara and Joe abused or neglected Jane.

In contrast, Jane's oft-repeated statements Kevin sexually assaulted her were sufficiently corroborated to support the court's finding Jane was the victim of sexual abuse. In each of her reports, Jane's descriptions of Kevin's actions demonstrated a "precocious sexual knowledge" for a child of Jane's age.[6] Z.P.R., 351 N.J. Super. at 436 (citation omitted). They were therefore supported by "the necessary corroboration required by N.J.S.A. 9:6-8.46[(a)](4)." Ibid. Thus, independent of any other evidence supporting a determination Jane was sexually

---

[6] Jane reported the details of Kevin's sexual abuse to Prosper and Raeford when she was seven years old, and she made her reports to Wisely and Dr. Byrnes when she was eight years old.

abused by Kevin, her statements describing Kevin's actions were sufficiently corroborated to support the court's finding Kevin sexually abused Jane.[7]

There was also competent circumstantial evidence corroborating Jane's statements she was told by Tara and Joe not to report Kevin's sexual abuse and threatened by them with punishment if she did so. Joe told Raeford he did not want Jane interviewed by the Division or the HCPO; he "shutdown" any cooperation by Jane, Tara, or himself with the Division; and he stated any investigation of Jane's allegations were to be conducted solely by him. Tara told Raeford that Joe instructed her not to allow Jane to be interviewed, and Joe admitted at trial he told Tara not to cooperate with the Division. Joe's admission he "shutdown" the investigation was a declaration he took the steps required to squelch any further disclosures by Jane, since she was the sole source of the allegations against Kevin. That evidence corroborates Jane's statements Joe directed her not to report Kevin's sexual abuse to anyone.

---

[7] Because Jane's statements describing Kevin's sexual abuse are sufficiently corroborated by her precocious sexual knowledge to support the court's determination the sexual abuse occurred, and Dr. Byrne's report, Dr. D'Urso, and the court found Jane's precocious sexual knowledge corroborated her reports about Kevin's abuse, it is unnecessary to address the claim Dr. D'Urso incorrectly relied on the accommodation portion of the Child Sexual Assault Abuse Accommodation Syndrome analysis to conclude Jane's psychological issues provided clinical support for her statements concerning Kevin's sexual abuse. See generally State v. J.L.G., 234 N.J. 265 (2018).

Moreover, Joe said Jane was either lying or exaggerating about the sexual abuse, and he was convinced Jane was not telling the truth. He also admitted discussing Jane's allegation concerning Kevin with her and explaining the "consequences" of lying. Joe also reported that Jane said she was afraid to tell him what occurred because she was fearful she would receive a beating; and he admitted there had been occasions he spanked her. In our view, Joe's admissions and statements corroborate Jane's statements because they are wholly consistent with Jane's reports that she was afraid to make the disclosures because she feared the consequences from Joe if she did so. See N.B., 452 N.J. Super. at 522 (requiring only "[s]ome direct or circumstantial evidence" supporting a child's statements to permit proper reliance on the statements to support an abuse or neglect finding under N.J.S.A. 9:6-8.46(a)(4)).

Similarly, Tara responded to Jane's initial report to Prosper with immediate anger and disbelief, expressing her dissatisfaction with Jane's statements and immediately labelling Jane a liar. Tara did not report Jane's sexual abuse allegations to the Division as Prosper directed, and Tara thereafter made clear to Raeford and Wisely that she and Joe would not cooperate with the investigation of Jane's allegations and did not want Jane to provide any information. Like Joe, Tara did all she could to prevent Jane from making

26

further reports to the Division about Kevin's sexual abuse, and Tara's statements and actions are consistent with, and provide evidence supporting, Jane's reports that Tara instructed Jane not to make any further disclosures.

Jane's report that Tara threatened the family would not move to North Carolina if she disclosed information to the Division is also corroborated by the evidence that Tara planned to relocate to North Carolina with her children to reside with or near Tara's family. Tara admitted that was her plan. Jane's statement her mother threatened not to make a planned move to another State if Jane made any further disclosures exhibited a knowledge beyond that which can be reasonably expected of an eight-year-old child. Her statement revealed an adult exercise of a diabolical leverage over a child: do not make any reports concerning Kevin or our family or you will be responsible for disrupting our family's plan to move to North Carolina. In our view, it is reasonable to infer that, at her age, Jane could not have conjured up such a threat unless, of course, it was true. See Z.P.R., 351 N.J. Super. at 436 (finding evidence of age-inappropriate knowledge provides corroboration for a child's out-of-court statements under N.J.S.A. 9:6-8.46(a)(4)). Thus, the evidence provided some support for Jane's report of Tara's threats of punishment and repercussions, and corroborate Jane's statements.

We also find Jane's very limited statements concerning Tara's substance abuse were sufficiently corroborated by the child's description of Tara's physical condition. Jane reported one instance of Tara's use of alcohol, describing Tara's wobbly legs, inability to stand, collapsing in a chair, and passing out while holding infant Judy in a manner that demonstrated a precocious knowledge of the effects of alcohol for a child of her age. Ibid.

We reject Joe's claim the court improperly relied on Dr. D'Urso's testimony that Jane's initial denial Kevin sexually abused her during her evaluation by Dr. Byrnes was "more consistent with recantation than a false positive," and that during the evaluation Jane demonstrated knowledge of the difference between a truth and a lie. Joe's claim the testimony "transgressed from a clinical finding to 'truth telling,'" see State v. J.Q., 130 N.J. 554, 582 (1993), is belied by the record. Dr. D'Urso's testimony concerning the recantation explained in part his conclusion Jane's family did not support her disclosure of information concerning Kevin. When considered in proper context, the testimony was not an expression of opinion on the truthfulness of Jane's statements. Similarly, the testimony about Jane's knowledge of the difference between a truth and a lie was presented as part of an explanation of the psychological evaluation process used at AHCH; Dr. D'Urso explained that

one of the baseline standards for the evaluation is ensuring the child understands the difference between a truth and a lie. Thus, contrary to Joe's contention, Dr. D'Urso did not offer an opinion as to Jane's truthfulness, and there is nothing in the record showing that the court relied on any affirmative testimony from Dr. D'Urso the child was truthful in making its fact-findings or abuse or neglect determination.[8]

In sum, we reject Tara's and Joe's claims that there was insufficient competent evidence supporting the court's findings that Kevin sexually abused Jane, Tara on one occasion abused alcohol, and Tara and Joe directed Jane not to make disclosures and threatened her with punishment if she did so. The court properly relied on Jane's out-of-court statements establishing those facts because her statements were sufficiently corroborated as required by N.J.S.A. 9:6-8.46(a)(4), and the court otherwise found the statements credible.

Tara and Joe also contend the court's findings of fact do not support the court's legal conclusion that they abused and neglected Jane. Joe argues the

---

[8] We also observe there was no objection to the portions of Dr. D'Urso's testimony upon which Joe's argument is based. For the reasons noted, we are satisfied that even if it was error to admit the testimony, it was not clearly capable of producing an unjust result. R. 2:10-2. The judge found Jane's statements were sufficiently corroborated and credible independent of any purported opinion of Dr. D'Urso that Jane's statements about Kevin were truthful.

court's finding he deprived Jane of needed counseling services is undermined by evidence showing that the only service ordered by the court was for the AHCH evaluation and Jane appeared for the evaluation when it was scheduled, which was the day before Jane was removed from Tara's and his care and custody. He contends the record is bereft of evidence supporting the court's determination that he or Tara ever blocked counseling for Jane. Tara similarly argues the court's determination she and Joe abused or neglected Jane is not supported by credible evidence and the court's determination they failed to "support Jane following her disclosure she was sexually abused by Kevin," even if true, does not constitute abuse or neglect under the circumstances presented here.

Tara's and Joe's arguments fail to account for the basic principle that a court must consider the dangers and risks presented by the situation in which the child is found to determine whether a parent has failed to exercise a minimum degree of care. G.S., 157 N.J. at 181-82. Before Jane made her initial disclosures, she was already a child that both her school and parents recognized required counseling. Her initial disclosure was made during a counseling session arranged by Tara as a result of Jane's problematic behavioral issues. It is within that context and situation that Tara's and Joe's actions supporting the court's abuse or neglect finding must be considered.

The court's findings Tara and Joe did not support Jane following her disclosures are supported by evidence they did what they could not to cooperate in the Division's investigation and, more significantly, dissuaded Jane from making any further disclosures and threatened punishment and repercussions if she did. We agree their respective failures to believe Jane's allegations would not support an abuse or neglect finding, but the court aptly determined their failure to provide Jane with support, coupled with their threats of punishment if she made further disclosures, established they abused or neglected the child.

Their conduct did not constitute mere negligence or even gross negligence. See T.B., 207 N.J. at 299-300 (explaining a failure to exercise a minimum degree of care requires proof of conduct that is grossly or wantonly negligent). They acted intentionally to prevent their seven-year-old daughter, who they knew otherwise suffered from psychological issues, from making truthful disclosures she was sexually abused and about other family issues. Joe said he shut everything down, and he did not do it by accident. He and Tara threatened Jane with punishment if she did not follow their directives and made clear that if she did, she would be punished.

They argue there is no evidence they interfered with Jane's counseling because the court never ordered counseling prior to Jane's removal from their

31

custody. However, they ignore Jane was in counseling when she made the initial disclosures. Prosper testified that, although there were some counseling sessions after the initial disclosures, approval for further counseling was obtained but no further counseling occurred because Tara, in accordance with Joe's direction that Jane not be available to make further disclosures, did not respond to efforts to schedule it. Tara's actions in this regard are consistent with her and Joe's decision to prevent Jane from making any further disclosures. Tara and Joe did not want Jane to make any disclosures, so the further counseling Jane needed, and required, ended. The record therefore supports the court's finding Tara and Joe deprived Jane of necessary counseling.

Tara's and Joe's actions were intentional and undertaken in abject disregard of Jane's ongoing psychological needs and issues. The totality of the circumstances establish they failed to exercise the minimum degree of care required to assist Jane in addressing and resolving her behavioral and psychological issues by interrupting her counseling, and they created a risk of further emotional and psychological harm by not only failing to support Jane but also by threatening her with punishment if she made honest disclosures about being a victim of sexual abuse and a witness to her mother's substance abuse. See G.S., 157 N.J. at 182 (explaining that in determining whether there was a

32

failure to provide the minimum degree of care, "the inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger").

Dr. D'Urso explained that deprivation of the counseling posed an ongoing risk of harm to Jane because she required the counseling before the disclosures were even made. But there is more. Tara's and Joe's actions re-victimized Jane by making Jane feel responsible for what followed her disclosures. Dr. D'Urso also opined that it did not serve Jane emotionally that she was told by her parents to deny what actually happened and not truthfully explain what actually occurred. Thus, Tara's and Joe's conduct resulted in actual emotional harm to Jane, as well as a risk of ongoing emotional harm.

Any arguments made by Tara and Joe that we have not expressly addressed are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed as to A-5173-17. Affirmed as to A-5866-17.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION